36    519
152   602
153    94
36      519
30 SC  118

36      519
f 35 SC  638

## Brubaker *versus* Okeson.

The meaning of words used in conversation, and what the parties intended to express by them, is exclusively for the jury to determine. It is not for the court to rule as matter of law, that the words amount to an estoppel *in pais.*

Nothing short of an agreement to give time, which binds the creditor, and prevents him from bringing suit against the principal, will discharge a surety.

Such an agreement cannot be inferred from the declarations of the creditor to the surety, that he considered the debtor possessed of property sufficient to discharge the liability, that he had or would give him time, that the debtor would pay the debt, and that he did not want the surety any longer.

Such testimony is inadequate to prove a direct and binding release of the surety; for it is quite possible to give time to the principal without affecting the liability of the surety; mere delay, without a binding agreement, will not have that effect.

It is essential to an equitable estoppel by matter *in pais*, that he who sets it up, should show that he has been misled to his hurt.

ERROR to the Common Pleas of *Juniata county.*

This was an action of debt by John Brubaker, for the use of Robert C. Gallagher, against William Sherlock (who was not served with process) and William Okeson, upon a joint and several single bill, of which the following is a copy:—

"$400.        Fifteen months after date, we or [either] of us do promise to pay to John Brubaker the sum of four hundred dollars, without defalcation, for value received, with interest from date. Witness our hands and seals the 1st day of February 1856.

"WILLIAM SHERLOCK, [SEAL.]
"WILLIAM OKESON." [SEAL.]

The defence was, that Okeson was the surety of Sherlock, and that Brubaker had released him by giving time to the principal debtor. The evidence given on the trial is fully stated in the following charge to the jury, delivered in the court below by GRAHAM, P. J.:—

"This action is upon a note dated 1st February 1856, signed by William Sherlock and William Okeson, for the payment of $400 to John Brubaker, fifteen months after date, with interest. Sherlock has not been served with process, and the case is now being tried against William Okeson alone. The defence is, that Okeson was the surety of Sherlock, and he was released from his suretyship by Brubaker.

"The evidence tends very strongly to show that Sherlock was the principal debtor and Okeson his surety. If you are satisfied

from the evidence that Okeson was the surety of Sherlock, then it becomes an important inquiry in the case, whether Brubaker released Okeson from liability to him on this note as the surety of Sherlock.

" The evidence shows that Sherlock lives in the West, and that Brubaker visited him in 1857; that after his return he met with Okeson at a sale, when the conversation relied upon by the defendant's counsel occurred. Jonathan P. Doyle, a witness called by the defendant, testifies that on the 3d December 1857, he was present and heard a conversation on this subject between Brubaker and Okeson; that Brubaker said to Okeson, ' that William Sherlock is good enough for the money, and I don't want you;' that Mr. Brubaker said he had been to the West to see Sherlock, and told of his prospects, said he had given him time till he would get his crops out; that he (Sherlock) was good enough, and Brubaker did not care about Okeson.

" James Gilliford testifies to the same conversation; that Brubaker said Sherlock had a good crop of wheat, a fine appearance for a good crop of corn, and a good stock of horses and cattle on his farm; that he had given him time, or would give him time, and that Sherlock would pay it, and that he (Brubaker) did not want Okeson any longer. If this conversation occurred, and it was all the conversation that occurred between the parties, and Okeson was the surety of Sherlock, it would discharge Okeson, and be an available defence, on the ground that it would lull the surety into security, and prevent him from taking any action for his own security or indemnity, and it would be a fraud upon the surety, for the creditor afterwards, contrary to his assurance, to call upon the surety for payment.

" To repel the effect of this evidence, the plaintiff has called William Hart, who testifies that he was present at this conversation, and the principal remark, that he remembers, was, that Brubaker said to Okeson, that if Sherlock did not pay that money in the spring, he would look to Okeson for it. The plaintiff also relies upon the evidence of John Woodward, who testifies that in a conversation with William Okeson, in December 1858, after Sherlock had made an assignment, Okeson spoke of Brubaker's claim against Sherlock, and said he expected to have it to pay, but that he would get it again, and that Sherlock would be able to hold his property.

" It is for you to pass upon this conflicting testimony. If Doyle and Gilliford stated all that occurred between these parties at the conversation referred to, Mr. Okeson would be discharged, and you should find for the defendant. On the contrary, if you believe that Brubaker, at the conclusion of the conversation, told Okeson that he would look to him for payment, if Sherlock did not pay in the spring, then the previous conversation, as testified to by Doyle

[Brubaker v. Okeson.]

and Gilliford, would not discharge Okeson, if at that time, as plaintiff's counsel allege, Brubaker gave notice that he would look to him for payment."

To this instruction the plaintiff excepted; and a verdict and judgment having been rendered for the defendant, the plaintiff removed the cause to this court, and here assigned the same for error.

*Alexander & Doty*, for the plaintiff in error, cited Cope v. Smith, 8 *S. & R.* 110; United States v. Simpson, 3 *Penn. R.* 437; Rhoads v. Frederick, 8 *Watts* 450; Miller v. Stem, 2 *Barr* 286; Whitehill v. Wilson, 3 *Penn. R.* 405; Campbell's Estate, 7 *Barr* 100; Albert v. Ziegler, 5 *Casey* 50; Kidder v. Kidder, 9 *Id.* 268.

*Parker* and *Casey*, for the defendant in error, cited Westmoreland Bank v. Klingensmith, 7 *Watts* 523; Harris v. Brooks, 21 *Pick.* 195; Hind v. Holdship, 2 *Watts* 104; Mercer v. Lancaster, 5 *Barr* 160; Austyn v. McLure, 4 *Dall.* 226.

The opinion of the court was delivered by

STRONG, J.—The original liability of Okeson to pay the debt was established, and indeed it was not denied. It was, therefore, incumbent upon him to show affirmatively his discharge from that liability. This he attempted to do, by evidence that he was a surety, and that the creditor had told him on one occasion that Sherlock, the principal debtor, was good enough for the money; that he did not want him (Okeson); that he had been to the West to see Sherlock; that he had a good crop of wheat, a fine appearance for a good crop of corn, and a good stock of horses and cattle on his farm; that he had given him time or would give him time, and that Sherlock would pay it, and that he did not want Okeson any longer. The court charged the jury that "if this conversation occurred, and it was all the conversation that occurred between the parties, and Okeson was the surety of Sherlock, it would discharge Okeson, and be an available defence, on the ground that it would lull the surety into security, and prevent him from taking any action for his own security or indemnity, and it would be a fraud upon the surety, for the creditor, afterwards, contrary to his assurance, to call upon the surety for payment." To this instruction the plaintiff excepted, and he has assigned it here for error.

It is noticeable, that the learned judge did not submit to the jury to find what the plaintiff intended, or what the defendant understood by the expressions, he had "given time" to Sherlock, and that "he did not want Okeson any longer." The court construed the language of the witnesses, and took away from the jury all inquiry as to its meaning. The rule however is undoubted, that

[Brubaker *v.* Okeson.]

the meaning of words used in conversation, and what the parties intended to express by them, is exclusively for the jury to determine: 9 *Watts* 59. It is obvious, that the testimony is utterly inadequate to prove a direct and binding release of the surety. The creditor said "he did not want Okeson any longer," but this did not amount to an agreement to discharge him, and if it did, it was entirely without consideration, and therefore inoperative.

Nor does the expression of the creditor that he had given time to the principal debtor, necessarily amount to proof of an equitable release of the surety. It was quite possible for him to give time, without affecting in the least the liability of Okeson. Nothing short of an agreement to give time, which binds the creditor and prevents his bringing suit, will discharge the surety. Mere delay, without such a binding agreement, will not. And, if such an agreement may be inferred, from a simple declaration of the creditor, that he had given time (which we do not admit), it is not to be inferred by the court, as a *presumptio juris et de jure*. Whether the jury were at liberty to draw such an inference need not now be considered. How they could, certainly is not manifest, for giving time, and a contract to give time, are distinct and independent things. Proof of the existence of a subject-matter, about which a contract may be made, would seem to have no tendency to prove that one in fact had been made.

Indeed, the learned judge of the Common Pleas does not appear to have rested the defendant's case upon either of these grounds. His view was, that the defendant was discharged, because the language of the plaintiff, alleged to have been proved, would lull him into security, and prevent his taking any action for his own indemnity; and because it would be a fraud upon the surety, for the plaintiff afterwards to call upon him for payment. The simple meaning of this is, that the plaintiff was estopped, not by matter of record, or by deed, but by matter *in pais*. The objection to it is, that there was nothing in the evidence to warrant the conclusion, that the defendant had been injured by the declarations of the plaintiff, or that he was in any worse condition than he would have been in, had those declarations never been made. Certainly, it was not for the court to say, as matter of law, that he had been injured. But it is essential to an equitable estoppel by matter *in pais*, that he who sets it up should show that he has been misled to his hurt: Dezell *v.* Odell, 3 *Hill* 215; Patterson *v.* Lytle, 1 *Jones* 53; Hill *v.* Epley, 7 *Casey* 334. It never yet has been held, that a declaration of the creditor that the principal debtor was good enough, that the surety was in no danger, and that the debt would be collected from the principal, without more, was sufficient to estop the creditor from proceeding against the surety. Such declarations are exceedingly common. They are often made to induce the surety to go into the contract, and they are repeated

afterwards, without any design to mislead, or without being under-stood as a waiver of any rights. They are made and received as expressions of opinion. They neither invite confidence, nor is confidence often reposed in them. Standing alone, they will not discharge the surety.

Bank v. Klingensmith, 7 *Watts* 523, does not sustain the charge of the court in this case. There the creditor held a judg-ment against the principals and the surety; the surety called upon the creditor, and requested that an execution might be issued to seize the principals' property about being removed; he stated that he wished to be released, and that the principal had property sufficient within reach of an execution to pay the debt; the creditor refused compliance, stated that the principal was good enough, and that he would give the defendant clear of his endorsement; no execution was issued. There is no similarity between that case and the present. There the surety was in motion to secure himself; he had a right to insist that execution should be issued, and he did insist. There was proof of actual injury in withholding the execution, an execution to which the surety was entitled on his request, and the case was put upon the ground, both in the court below and in this court, that he had sus-tained injury, not from the declarations of the creditor, but from the withholding of the execution.

The case of Harris v. Brooks, 21 *Pick.* 195, relied upon by the defendant in error, is not unlike Bank v. Klingensmith. There the surety was also in motion; he called upon the creditor, and stated that if he had to pay the debt he wished to attend to it soon, as he then could get security of the principal; the creditor assured him that he (the creditor) would look to the principal for payment, and that he (the surety) need not give himself any trouble about the note, for he should not be injured. The case was put to the jury with the instruction that, if in consequence of this assurance of the creditor, the surety omitted to take up the note and secure himself out of the property of the principal debtor, he was discharged. The defence, therefore, as in Bank v. Klingensmith, rested not in the declarations of the creditor alone, but on them and superadded evidence that there had been actual harm resulting from them to the defendant. This essential to estoppel *in pais* was, therefore, not wanting, as it is in the present case. The language of Chief Justice SHAW is to be understood as applicable to the case he then had in hand, a case in which the jury had found that injury had resulted from the declarations of the creditor, and the only question therefore was, whether they were such as to warrant his relying upon them, and guiding his action by them. Surely, without having been the occasion of injury to the defendant, the creditor cannot be guilty of a fraud upon him, by calling upon him to pay a debt which he

[Brubaker *v.* Okeson.]

has promised to pay, and no declaration which has not, in fact, influenced his conduct can have done the surety any harm. In losing sight of this, consists the error of the charge, and for this reason, pointed out in both the assignments of error, the judgment must be reversed.

Judgment reversed, and a *venire de novo* awarded.