Machen *v.* Budd Wheel Co., Appellant.

Argued May 15, 1928. Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

*Henry S. Drinker, Jr.,* with him *Dickson, Beitler & McCouch,* for appellant.—The contract relied on by plaintiff was not for his working life, but for an undefined term: McNeely v. Bookmyer, 292 Pa. 12.

The agreement as construed by plaintiff would have been beyond Budd's power as president: Smith v. Crum Lynne I. & S. Co., 208 Pa. 462.

The contract relied on by plaintiff was indefinite as to plaintiff's compensation: Butler v. Kemmerer, 218 Pa. 242; Smith v. Crum Lynne I. & S. Co., 208 Pa. 462; Lentz v. Choteau, 42 Pa. 435; Franklin Sugar Co. v. Howell, 274 Pa. 190.

The trial court erred in admitting proof of the salaries of defendant's president, vice-president and other officers.

The trial court erred in admitting testimony that in 1925 defendant made a profit of $1,185,000.

The question as to whether defendant has been guilty of breach of this contract is res judicata: O'Connor v. O'Connor, 291 Pa. 175; Larkins v. Lindsay, 205 Pa. 534; Columbia Nat. Bank v. Dunn, 207 Pa. 548; Cist v. Zeigler, 16 S. & R. 282; Marsh v. Pier, 4 Rawle 273; Gordinier's App., 89 Pa. 528; Frauenthal's App., 100 Pa. 290.

There was no competent testimony that defendant has ever used plaintiff's invention.

*Thomas Raeburn White,* of *White, Parry, Schnader & Maris,* for appellee.—Plaintiff invented a process; his application for a patent as prepared by defendant was for a process patent; Budd and Ibach invented a machine for practicing plaintiff's process.

A machine cannot anticipate a process: Carnegie Steel Co. v. Iron Co., 185 U. S. 403.

There was ample evidence that defendant has used and is using plaintiff's invention.

Plaintiff proved an enforceable contract for permanent employment: Weidman v. United Cigar Stores, 223 Pa. 160; Pierce v. R. R., 173 U. S. 1; Beck v. Walkers, 24 Pa. C. C. R. 403.

The terms of the contract as regards the salary to be paid plaintiff were sufficiently definite to be enforce-

able: Weaver v. Wood, 9 Pa. 220; Philliber v. Endelblute, 188 Pa. 468; Snyder v. Chocolate Co., 63 Pa. Superior Ct. 528; Butler v. Kemmerer, 218 Pa. 242; Thompson v. Stevens, 71 Pa. 161.

The question whether defendant made a contract with plaintiff for permanent employment is not res adjudicata: Hibshman v. Dulleban, 4 Watts 183; Finley v. Hanbest, 30 Pa. 190; Forcey's App., 106 Pa. 508; Jackson v. Thomson, 215 Pa. 209.

The trial court did not err in admitting evidence of the salary scale of defendant's officers and employees.

OPINION BY MR. JUSTICE SCHAFFER, September 24, 1928:

Plaintiff seeks to recover damages for the breach of a word of mouth contract of employment. The jury gave him a verdict for $450,000 and defendant appeals from the judgment thereon. On a previous trial, he recovered $250,000, which was set aside on the ground that his measure of damages was not properly proved.

Appellee in the year 1919 was employed by defendant as a salesman at a salary of $4,000 per year. While so employed he claims he invented a patentable process of rolling tapered steel discs for making tapered disc automobile wheels. He communicated the idea to defendant's president, Edward G. Budd, later writing him a letter on February 3, 1919, in which he suggested the payment of a small royalty in consideration of his assigning the patent to the company. Two days later Budd replied in writing saying defendant had an invariable rule that it would not under any circumstances pay royalties to an employee, adding that if plaintiff's idea should prove of value they would probably have to compensate him if they took over his invention. Shortly after the receipt of this letter, plaintiff saw Budd in his office. The conversation began, so plaintiff says, by Budd telling him that he and the vice-president had been discussing him, plaintiff, and wanted to increase his salary

but were unable to do so because their company was not making money. Budd then produced an application for a patent and requested plaintiff to sign it and also to execute an assignment thereof to defendant, which plaintiff refused to do. Budd then said "Well, then, if you will turn this over to us, it will insure your future in the company, and we will agree to raise your salary from time to time in proportion to the increased use of the invention." Budd added that he would give him two days to decide what to do. "You will either turn this over to us, based on my offer, or you will get out of the company." At the end of the two days, plaintiff again went to defendant's office, met Budd and said to him, "Mr. Budd, I have thought over your offer, and I have decided to accept it. I will turn this over to you based on your offer that my future will be assured in the company and that my salary will be raised from time to time in proportion to the increased use of the invention, and I am going to look to you to carry out your part of the contract." To which Budd replied "I am very glad that you have come to that conclusion. You will never have cause to regret it," and handed over to plaintiff the application for the patent and the assignment, which plaintiff executed. Budd denied the conversation as detailed by plaintiff, but, the jury having found in the latter's favor, we take the terms of the contract as given by him. A few months later plaintiff was discharged from the company's service, the employee who so notified him stating that Budd had told him to say to plaintiff that if by the first of the following month he had not secured another position, he, Budd, would pay him an extra month's salary. Plaintiff said nothing about having a contract of employment with defendant and replied "all right." Not having secured employment, plaintiff wrote asking for the extra salary. In this letter, no mention was made of the alleged contract. He received no reply.

Defendant made application for the patent under the assignment from plaintiff, but it was refused by the patent office. In the meantime Budd and one of defendant's employees named Ibach had been conducting experiments in making a disc wheel using plaintiff's basic idea but other methods than his to produce results. The application for plaintiff's patent, following the action of the Commissioner of Patents in rejecting the claims contained therein, was not pressed and abandoned and a new patent embodying his fundamental idea was applied for by Budd and Ibach and was granted. Certain features of plaintiff's claim for a patent were set forth in the Budd-Ibach application in almost the precise language of his application. Defendant procured patents for plaintiff's invention in Great Britain and in France.

At the time of plaintiff's discharge in October, 1919, defendant had manufactured no disc wheels under his or the Budd-Ibach plan. In that year it made 339 disc wheels; in 1920, 17,625; in 1921, 65,200; in 1922, 395,-971; in 1923, 827,510; in 1924, 1,054,675; in 1925, 1,-570,873 and in 1926, the year before this case was tried, 1,658,765.

Plaintiff learned that defendant was manufacturing disc wheels in quantity, and on January 4, 1921, filed a bill in equity in the United States District Court seeking the cancellation of his assignment and reciting his alleged contract of employment as the consideration therefor and his dismissal. When he began this proceeding, plaintiff supposed the patent had been granted, whereas the fact was that the two applications, his and the Budd-Ibach, were being prosecuted in the patent office side by side. Plaintiff did not learn that his patent had been refused until his case in the district court was on trial in May, 1923. Plaintiff's bill was dismissed by the district court for reasons which will hereafter be adverted to. As originally filed, the Budd-Ibach application may not have fully covered plaintiff's basic process and would seem to have been more particularly for a

machine to apply the process; as amended, shortly after plaintiff began suit in the district court, however, it did cover plaintiff's basic idea and process. By this defendant protected itself against the use of the process by others on a different kind of machine. The Budd-Ibach patent was issued January 16, 1923. Budd himself testified that under the process described in the patent they had manufactured all the wheels. Our conclusion is that the wheels were made under the process devised by plaintiff, although by a machine differing from that which he contemplated and that defendant had incorporated plaintiff's process in the Budd-Ibach patent.

In no event could the verdict before us be sustained, because of errors committed on the trial. The trial judge admitted testimony as to the salaries paid to defendant's president, vice-president, secretary and treasurer, and works manager. It was not by their salaries that plaintiff's compensation was to be measured under the contract as he states it, but by the salaries of salesmen. The present worth of such a salary and reasonable increases thereof not exceeding salaries paid in the department of the business in which he was employed, less such sums as he had earned and might earn in the future, would measure the extent of plaintiff's loss by defendant's breach of that part of the contract respecting his continued employment, if he is entitled to recover at all. The trial judge was mistaken in permitting the salaries of the executive officers to be shown, telling the jury that they could measure the amount of plaintiff's recovery by the "compensation paid by defendant to persons holding such position as the plaintiff would be qualified to fill, in such an organization." This left them free to measure the salary which they might conclude he should receive by the salaries of the chief executive officers of the corporation.

It was also erroneous to admit testimony of the profits made by defendant in the year 1925 of $1,185,000. This and the evidence of salaries paid the executive officers of

the company were responsible no doubt for the excessive verdict rendered, $450,000. The court endeavors to justify the receipt of the evidence of profits on the ground that it tested the credibility of Budd, who had stated that in the year 1925 bonuses were not paid to its officers because the profits of the business did not justify their payment. The contradiction, if there was one, was upon an entirely immaterial matter; why bonuses were not paid that year had no bearing on the issue being tried. Plaintiff's salary increase was not to be measured by profits made but by the increased use of the invention. The harm of this testimony was intensified in the charge, where it was said that plaintiff's compensation should be measured by the profits made, the language in this respect being: "Plaintiff contends that as the process becomes profitable or more useful to the company, he would share in the benefits derived therefrom......The agreed valid consideration as explained by Mr. Machen was the assignment of his patent or his process in return for the guarantee of his future and a possible sharing of the profits from the usefulness of his process."

The court also erred in instructing the jury: "When a parol contract is disputed it becomes a jury's duty to interpret or determine the true understanding of the terms of the contract. In the case of a contract which has not been reduced to writing it is the duty of the jury to interpret or construe it. It is your duty to ascertain what was intended by that contract when it was made, what each party to it intended should be done. It is for you to determine what the contract, if any, means." It was not for the jury to interpret the contract, it was for them to fix its terms and for the trial judge to determine its legal effect. "The terms of an oral contract are for the jury, but its legal effect is for the court": Erie Forge Co., Ltd., v. Penna. Iron Works Co., 22 Pa. Superior Ct. 550; Codding v. Wood, 112 Pa. 371; Elliott v. Wanamaker, 155 Pa. 67; Saxman v. McCormick, 278 Pa. 268,

273; Campagna v. Ziskind, 287 Pa. 403, 408; Williams v. Cook, 289 Pa. 207, 214.

Defendant contends that the contract as averred by plaintiff is not as he claims for his working life, but for an undefined term and that it is too indefinite and uncertain as to his compensation to be enforced, that under its terms as plaintiff states them it created no duty to employ him for life and to increase his salary; in short, plaintiff claims employment for life, defendant that its undertaking under the language used amounted only to employment at will, that plaintiff made the assignment of his invention to prevent immediate discharge which would have resulted from his failure to execute it.

Counsel for the respective parties cite to us cases supporting their contentions on the question now under consideration, appellant's those holding certain contracts to be too indefinite for enforcement;[1] appellee's those in which contracts alleged to be indefinite were enforced.[2] We think, however, that precedents do not cut a great figure in such an inquiry as we are pursuing. They are like precedents in will cases: Tarter's Est., 291 Pa. 458. The language used in each instance is different, and so are the circumstances. While the decided cases are not controlling, Butler v. Kemmerer, 218 Pa. 242,

---

[1] Butler v. Kemmerer, 218 Pa. 242; McNeely v. Bookmyer, 292 Pa. 12; Ogden v. Phila. & West Chester Traction Co., 202 Pa. 480; Smith v. Crum Lynne Iron & Steel Co., 208 Pa. 462; Edgcomb v. Clough, 275 Pa. 90, 103-104; Bastian v. Marienville Glass Co., 281 Pa. 313.

[2] Weidman v. United Cigar Stores Co., 223 Pa. 160; Pierce v. Tennessee, etc., R. R. Co., 173 U. S. 1; Rhoades v. C. & O. Ry. Co., 49 W. Va. 494; Harrington v. Kansas City Cable Ry. Co., 60 Mo. App., 223; Railroad Co. v. Staub, 75 Tenn. 397; Brighton v. Lake Shore, etc., R. R. Co., 103 Mich. 420; Carter White Lead Co. v. Kinlin, 47 Neb. 409; Fisher v. Roper Lumber Co., 183 N. C. 485; Weaver v. Wood, 9 Pa. 220; Philliber v. Edelblute, 188 Pa. 468; Snyder v. Hershey Chocolate Co., 63 Pa. Superior Ct. 528; Thompson v. Stevens, 71 Pa. 161; Worthington v. Beeman, 91 Fed. 232; Noble v. Burnett Co., 208 Mass. 75; Olson v. Shuler, 203 Iowa 518.

bears somewhat of an analogy to the one in hand. There, as here, plaintiff was an employee of a corporation. He desired to have his compensation increased and wrote to defendant, who was the principal stockholder in the company, making the suggestion. He testified that the defendant said to him, "He should be well compensated, and that if there were any profits made in the business, he would divide them upon a very liberal basis." Profits were made, which the defendant as a stockholder received. Plaintiff claimed that under the contract he was entitled to a share of them. We said: "It must be remembered that the question involved is not the value of the services. If that were the issue, it might fairly be ascertained by evidence and fixed by the jury. But there is nothing in the case from which we can infer that the amount to be paid to the plaintiff would be based upon a quantum meruit. The question is,—admitting the truth of the plaintiff's statement that Mr. Kemmerer agreed to divide with him his profits,—how, or upon what basis, was that division to be made?.......Our concern is as to the incompleteness of the alleged contract. To form the basis of a legal obligation, an offer must be so complete that upon acceptance an agreement is formed which contains all the terms necessary to determine whether the contract has been performed or not. ......Price is as essential as any other of the terms of a contract, and without this agreed upon no contract exists.......The jury were not at liberty to fix or determine a basis for the division of the profit, when the parties themselves had failed to reach any agreement as to that very material matter. Any such attempt by the jury would be nothing more than a guess or conjecture. There was no standard by which they could measure the degree of liberality with which the defendant should reward the plaintiff." We followed this case in principle in our recent decision: McNeely v. Bookmeyer, 292 Pa. 12.

When the two men, plaintiff and Budd, sat down to talk, they were dealing with a prospect. Nothing was said about life employment. It would seem remarkable, if plaintiff was bargaining for a life job, that he did not so state, but allowed this most important feature to rest in the vague statement that his future with the company would be assured. We think what was said by Budd had the same import as what was uttered in Bird. v. Prescott Co., 89 N. J. L. 591, 99 Atl. 380, and amounted to no more than a friendly assurance of employment and is not sufficiently definite to constitute an enforceable contract of life employment. It should be remembered that plaintiff is not claiming on either a quantum meruit,—what his services were really worth,—or on a quantum valebat,—the reasonable value of the thing he gave up,—not on an implied contract, but on an express agreement to pay him a salary based on the use of his process. Neither at the time of his discharge nor subsequently, until the bringing of this suit, did plaintiff set up a claim for life employment. In his testimony in the district court in 1923 he did not. This strongly negatives the idea that he believed he had such a contract: McNeely v. Bookmyer, supra.

When we come to the question of compensation, the alleged contract is still more vague. "We will agree to raise your salary from time to time in proportion to the increased use of the invention." At the time this was said no wheels were being made. The first year of the manufacture 339 were produced, in 1926, 1,658,765, or more than 4,800 times as many; of course, it could not have been contemplated that his salary was to be increased 4,800 times, which would have made it $19,200,000 for the year 1926. If we take the first year of commercial production when 17,625 wheels were made and strike a proportion with 1926, the increase was almost a hundredfold and on such a proportion plaintiff's salary would be in the neighborhood of $400,000 for that year, which we think it never could have been intended

to be; indeed in the case in the United States District Court plaintiff fixed the entire value of his invention at "not less than" $50,000. Under the contract, as plaintiff avers it, no tangible basis,—no standard, as we said in Butler v. Kemmerer,—is furnished to determine the amount which was to be added to his existing salary of $4,000 by reason of defendant's use of his invention. The incongruous verdicts rendered, one for $250,000, and the other for $450,000, shows the great uncertainty in the alleged contract.

We now come to a very vital matter: Is the question whether the contract here in issue is sufficiently certain and definite to be enforceable, res judicata, because of the proceedings in the United States District Court and its decree dismissing plaintiff's bill. The bill recites the oral contract between plaintiff and defendant, as he has detailed it here, "that if he would assign the patent rights to the defendant, he, your orator, would be continued in its employ; that your orator's future in the company would be definitely assured and his salary increased from time to time in proportion to the increased use of the invention," and sets forth that, under the circumstances of his dismissal, the assignment was voidable and he elected to avoid it and to rescind the verbal agreement made between him and defendant. The prayers were inter alia that defendant be ordered to reassign the patent to plaintiff, and for an accounting of profits made from the invention. The answer denied that the oral contract was made as plaintiff alleged and averred that he was dismissed because of the neglect of his duties as salesman. In paragraph 14 of plaintiff's statement of claim in the case before us, he alleges specifically the filing by him of his bill in the federal court "alleging failure of consideration and praying that said Budd Wheel Corporation should be ordered to reassign to the plaintiff all the right, title and interest in the said invention which had been assigned by plaintiff to the said

Budd Wheel Corporation." The consideration was his continued employment under the contract.

At the trial in the district court, plaintiff was the only witness called. He testified not to the contract in the language in which he now puts it but that: "He [Budd] said they wanted this invention of mine assigned by me to their company. I told him that I was not prepared to do that at that time......Mr. Budd told me that I would have to assign the patent to them within two days or get out. He said that if I did assign the invention to them it would be to my advantage; and that with the use of the invention my salary would be raised, and that it would be of considerable benefit to me. He gave me two days to decide, and I took the two days; and relying upon his statement that it was a matter of honor with them, I decided to accept his proposition and place the trust in his honor and that of Mr. Adams and Mr. Read [officials of the company] that he had demanded of me, and executed the assignment." It will be noted that this is very different from the contract as testified to by plaintiff in the pending case and amounts to no contract at all, a mere reliance upon the honor of Budd that his salary would be raised and that as a result of the assignment he would be advantaged and benefited without disclosing how. The plaintiff further said, "Mr. Budd told me that Billy Read and Hugh Adams and himself were not men to take advantage of me and that I could depend upon them, and that it was a matter of trust and confidence in their honor for me to comply with his request to make an assignment to the company of my rights." This statement completely negatives the idea of a binding contract or a contract of any kind. Plaintiff further said: "As Mr. Budd said that this assignment was a matter of honor with him, and if he carried that into his business relations, I considered that I was not misplacing my trust in him and I therefore executed these papers. It might not have been good business to do it that way, but I considered that I had the

right to expect good treatment from him. He stated that I was in honor bound to trust his word in every way; and that if I did trust his honor I would get something out of it. Those were the reasons that I made the assignment." This is far afield from what plaintiff testifies to now.

The able judge of the district court, Judge DICKINSON, in disposing of the case, said: "The complaint stated in terms of its supposed facts is that the plaintiff was employed as a salesman of the defendant's products. The employee devised or discovered a method or process of producing wheel discs which was of great value to the employer. The defendant demanded that the plaintiff assign his right to a patent for the invention, threatening him with a discharge from his employment if he refused, and assuring him that he could safely trust the employer to reward him for his loyalty if he did what was demanded of him. An immediate decision was required. Fearing the loss of employment and trusting to the promise of its continuance and other benefits held out to him, the plaintiff executed the assignment...... The position of the employer meant (and this plain fact must be faced) that if the employee would not give the employer the benefit of the discovery, which was evidently then thought to be of vital consequence to the business, the relation of employee and employer must end. This brought the plaintiff into the dilemma of giving up either his invention or his employment......The employer sought to soften the blow by inciting the hope in the plaintiff that he would in the end not lose but gain by giving up his invention. It is this which has caused the present controversy......The difficulty in the way of [entering a decree in plaintiff's favor] is that it would be to make a contract for the parties which they had not made for themselves......No other decree can be made than one of dismissal of the bill."

On a motion for leave to file a bill of review, Judge DICKINSON, in his opinion, said: "The question was

whether this title thus acquired by the defendant was so far the fruit of fraud or there had been such a failure of consideration as that the plaintiff should be enjoined to turn back to him all claim of title which it held...... The plaintiff fully appreciated the position in which he was placed. He ascribed great value to his invention; doubtless he, as all inventors are wont to do, very much overvalued it. He saw that his employers thought the invention of value to them in their business and coveted it. If he held on to his invention and exacted from his employers what he thought was an adequate price for it or if he used it in business rivalry with them, he foresaw at least a possible break in the harmony of their relations. If he yielded to what he knew was their wishes, he expected and thought he foresaw an advantage to himself as great or greater than any he would reap from his invention. He might have compromised on the grant of a license to them, or have required of them the binding obligation of a contract, but he did neither. He assigned to them all his right to a patent, trusting only to their assurance that this would be for his best interests. In this he was disappointed......The question raised by the original bill was whether the disappointment in his expectations of return favors from the defendant gave him the right to revoke his grant......The assignment of all patentable rights to the invention here was made and accepted in the common expectation that the relation of the parties as employed and employer would continue, and that the assignment itself would promote the harmony of such relation. No agreement, expressed or implied, was however made respecting the duration of such relations and either party was legally free to end them."

Plaintiff's counsel argues that the action of the United States Court is not res judicata because he says the question of the existence and construction of the contract only incidentally arose in that proceeding. With this, however, we cannot agree. It was the very thing in con-

troversy. The plaintiff pleaded the contract in identical terms as he now avers it and demanded back his patent because defendant had not fulfilled its part of the contract. There was presented to the district court for decision the flat question whether plaintiff had assigned his patent rights to defendant in consideration of a promise by the latter to employ him permanently, or to prevent his immediate discharge. That is the precise issue in the present case. It is true that when it came to testifying, plaintiff did not state the terms of the contract as he had set them out in his bill, but he pleaded them as he now testifies they were; that his proofs failed to substantiate his allegation in no wise changes the legal effect of the court's passing upon the alleged contract and finding that none existed. If the rule were otherwise, then all that a plaintiff who had set up a right to be determined in litigation, and had fallen down in his proof of it, would have to do to escape the bar of res judicata to his subsequent proceeding would be to change his testimony. The contract which plaintiff pleaded in his first suit and attempted to sustain was the vital matter in that proceeding, if he failed to sustain it, his proceeding fell, and as he did so fail, and did not appeal from the decision of the tribunal which heard him, he was barred from again asserting the same right in subsequent litigation: O'Connor v. O'Connor, 291 Pa. 175; Klick v. Gernert, 220 Pa. 503; Larkins v. Lindsay, 205 Pa. 534. True it is, as plaintiff's advocate argues, that, in order that the res judicata rule may be successfully invoked, the issue claimed to be settled must have been directly involved in the case and must have been decided as a necessary part of the decision: Hibshman v. Dulleban, 4 Watts 183; Finley v. Hanbest, 30 Pa. 190; Moser v. Phila., Harrisburg & Pittsburgh R. R. Co., 233 Pa. 259 and not be something incidentally cognizable: Forcey's App., 106 Pa. 508; Jackson v. Thomson, 215 Pa. 209. One of the tests is: did the controverted matter, appear in the pleadings: Forcey's App., supra. Here

the contract we are to pass upon appeared in the pleadings in the suit brought in the district court in the exact terms in which we have it. There the real question to be decided as plaintiff stated it was: Had he "induced by the promises and undertakings of Budd" [that is to say, by the alleged oral contract] and in consideration thereof, executed a document assigning to the defendant your orator's rights to a patentable invention?" and the court determined that he had not, because no such contract was made as plaintiff averred, that what Budd said to plaintiff did not constitute an enforceable contract. That is the precise question here. What we are asked by appellee to determine in his favor is that there was an agreement by defendant respecting the duration of their relations and his compensation; that question he has already submitted to another court of competent jurisdiction and its decision, adverse to him, bars his right to relitigate it before another tribunal. The court below was in error in refusing to receive the record of the proceeding in the United States District Court; it should have been admitted in evidence and upon it the court should have determined the controversy against appellee.

Plaintiff contends that, as some parts of the determinations of the district court were made upon a bill of review, res judicata does not apply; that findings made by a court upon a petition for a bill of review are not to be considered binding or res judicata, citing 2 Daniels Chancery Pleading & Practice, 6 Am. ed. 1578, note 2; Hopkins v. Hebard, 194 Fed. 301 (235 U. S. 287); Acord v. Western Pocahontas Corp., 156 Fed. 989; Elliott v. Balcom, 77 Mass. 286; 2 Foster's Fed. Prac. 2192; Home Street Ry. Co. v. City of Lincoln, 162 Fed. 133, 138. It is sufficient to remark as to this contention that what was said by Judge DICKINSON in his opinion on the petition for the bill of review was in elaboration and explanation of his views on the case as originally presented.

The conclusion is inevitable and must be reached that plaintiff is not entitled to recover, first because the alleged contract is too indefinite and uncertain to be enforced, and second because the subject-matter of his suit is res judicata.

The first assignment of error is sustained and the judgment is reversed and here entered for defendant.

Mr. Justice KEPHART dissented.