McCormack, Appellant, *v.* Jermyn.

Argued Dec. 5, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*M. J. Mulhall,* with him *John T. Mulhall,* for appellant.

*Abram Salsburg,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, January 2, 1945:

A jury was instructed that it was its function to find the terms of a disputed oral contract and, from all the circumstances, what the real understanding was of the parties. The jury having found for plaintiff, the court subsequently concluded that the trial judge should have construed the contract as a matter of law, and it entered judgment n. o. v. for defendant. The question on appeal is whether its action in this regard was correct.

William S. Jermyn, defendant, was, as owner, lessee or otherwise, interested in several operations for the mining, preparation and sale of anthracite coal. Plaintiff's assignor, Frank McCormack, was engaged in general construction work and the business of coal stripping. Coal stripping consists of the removal of the soil, rock or "over-burden" on seams of coal which lie near the surface and cannot be safely or economically mined by subterranean operations; such coal is known as "outcrop coal", being the out-crop of the vein as it rises up

from the basin; after the coal is exposed it is dug out by means of excavating shovels.

McCormack and defendant met on January 29, 1940. Defendant discussed the stripping of a tract in which he had some kind of interest, and expressed great confidence in the belief that it was underlain by large veins of coal. According to plaintiff's testimony—which, of course, is alone to be considered for present purposes—defendant agreed that, if McCormack would bring over some equipment which he had been employing on a neighboring operation and would strip this tract, defendant would pay him $1.85 per ton if the coal proved to be discolored and $2.00 per ton if "grade A". Defendant further agreed, in the words ascribed to him by McCormack, that "if there is no coal there I will pay all expense of moving the equipment and rental on your equipment." In another part of his testimony McCormack quoted defendant to the effect that "If the coal wasn't there he would pay us our expenses, and a fair equipment rental value on our machinery." McCormack started the operation but no coal was discovered until February 22, when 313 tons were obtained; on investigation, however, this proved to be, not the ordinary "out-crop" coal, but the contents of a "stump", which is the base or remains of a worked-out pillar left after previous mining operations in order to support the surface. Defendant, still optimistic however, directed McCormack to continue, which McCormack did for several weeks but without success. A year and a half later this suit was brought to recover the sum of $10,327.52 representing the rental value of the equipment, the expense of labor, and the cost of material and supplies. At the trial a credit was allowed to defendant of the amount received from the sale of the 313 tons recovered and sold, leaving a net claim of $9,736.07, for which amount the jury returned a verdict in plaintiff's favor.

Defendant testified that no such contract as claimed by McCormack was entered into, but, in any event, con-

tended that plaintiff was not entitled to recover even if McCormack's version was correct, inasmuch as the reimbursement for expenses depended on "no coal" being discovered, whereas in fact 313 tons were obtained from the operation. Plaintiff countered with the argument that not only was the "stump coal" not the "out-crop coal" which had been the subject-matter of the contract within the contemplation of the parties, but that it was in such an insignificant and unappreciable amount that, from a practical standpoint, it was "no coal" within the meaning of the contract as the parties understood and intended those words.

The learned trial judge charged the jury that if the coal recovered from the operation was "out-crop coal" and "coal of the quantity within the common understanding of the parties" they would have to find for defendant, otherwise for plaintiff. He refused to affirm defendant's points for charge to the effect that the words "no coal" precluded plaintiff from recovery, that McCormack could have protected himself in entering into the contract by stipulating that if no coal of *profitable or sufficient quantity* was discovered he would be entitled to his expenses, but that, not having done so, the jury must accept the words "no coal" as intended to mean the absence of *any* coal. The court entered judgment for defendant n. o. v. on the ground that the trial judge should have affirmed those points and not have allowed the jury to give an interpretation to a non-technical word other than what it imported in ordinary and common usage.

In the case of a disputed oral contract there is a well marked distinction between the relative functions of court and jury. There are three successive stages of inquiry: first, what were the *terms* of the contract; second, what was the *understanding* of the parties as expressed by those terms; third, what was the *legal effect* of the agreement as thus determined and interpreted. The authorities are clear to the effect that the

first two of these processes are for the jury as questions of fact; the last is for the court as a matter of law.

"Now, it is obvious that the sense of words used in conversation, *and what the parties meant to express by them,* is for the jury to determine, and not for the court. It is the conceded province of the court to expound the meaning of an instrument, but that it extends not to words uttered, of which there can be no tenor, is evident from the uniformity with which it is spoken of in reference to the interpretation of writings. . . . That the construction of an oral agreement belongs to the jury, . . . is so often repeated in our own reports that I forbear to enumerate the cases. . . .": Chief Justice GIBSON in *McFarland v. Newman,* 9 Watts 55, 59. "The rule however is undoubted, that the meaning of words used in conversation, *and what the parties intended to express by them,* is exclusively for the jury to determine": *Brubaker v. Okeson,* 36 Pa. 519, 521, 522. *"The sense of words used in connection with what the parties intended to express by them* is exclusively for the jury to determine. The judge may not put a legal interpretation on oral words, and make it a matter of positive direction. It is the province of the court to expound the meaning of an instrument, but not of words uttered of which there can be no tenor": *Maynes v. Atwater,* 88 Pa. 496, 497. "If the contract is verbal, it is, of course, the exclusive province of the jury to inquire, *and ascertain what the parties meant;* if it is in writing, its construction is for the court": *Forrest v. Nelson,* 108 Pa. 481, 488. "What was said and done, *what was intended by what was said and done,* are questions of fact for the jury": *Fulton v. Lancaster Co.,* 162 Pa. 294, 297, 29 A. 763, 766. "Where a contract is made orally, the question of its effect is not one of mere interpretation, declaring the legal meaning of terms employed. The inquiry then is, in the first place, What was the language used by the parties? and, in the second place, *What was intended and understood by them when they used it?* and these

are questions of fact, not of law": *Schweyer v. Walbert,* 190 Pa. 334, 338, 42 A. 694, 696. Instead of compiling further quotations to the same effect, it will suffice to cite in general: *Camden Wood Turning Co. v. Malcolm,* 190 Pa. 62, 65, 42 A. 458, 459; *Scottish Rite Association v. Union Trust Co.,* 195 Pa. 45, 50, 45 A. 651, 653; *Philadelphia, to use, v. Stewart,* 201 Pa. 526, 530, 531, 51 A. 348, 349, 350; *Speers v. Knarr,* 4 Pa. Superior Ct. 80, 84 (per Rice, P. J.) ; *Park v. Kansas City Southern Rwy. Co.,* 58 Pa. Superior Ct. 419, 425; *Herring v. Weinroth,* 61 Pa. Superior Ct. 529, 532. It is only the *legal effect* of the contract, after its terms and meaning have been established, that must be determined by the court as a matter of law.*

In performing its duty of determining the factual meaning of an oral contract what is the standard of interpretation to be observed by the jury? A verbal agreement differs from a written one in this, that in the construction of the latter all negotiations leading up to the contract are presumed to be merged in the writing; moreover, oral testimony is not admissible to explain the written document in the absence of an ambiguity requiring such explanation. But in an unwritten contract, where the words constituting the agreement are merely parts of, and embedded in, a general conversation, the scope of interpretation is more extended, and indeed, even in the case of a written contract, the agreement, if there is any doubt about its meaning, must be interpreted "with reference to the circumstances under which the parties contract and in the light of the objects to be

---

* *Codding, Administrator, v. Wood,* 112 Pa. 371, 377, 3 A. 455, 457; *Elliott v. Wanamaker,* 155 Pa. 67, 74, 25 A. 826; *Sawman v. McCormick,* 278 Pa. 268, 273, 122 A. 296, 298; *Campagna v. Ziskind,* 287 Pa. 403, 408, 135 A. 124, 126; *Koch v. Matter,* 307 Pa. 337, 340, 341, 161 A. 309. Properly understood, what was said in *Machen v. Budd Wheel Co.,* 294 Pa. 69, 76, 143 A. 482, 484, is to the same effect. (See *Prenzel, Trustee, v. Apex Hosiery Co., Inc.,* 299 Pa. 17, 20, 148 A. 915, 916.)

accomplished": *Myers' Estate,* 238 Pa. 195, 211, 86 A. 89, 94; *Camden Safe Deposit & Trust Co. v. Eavenson,* 295 Pa. 357, 363, 145 A. 434, 435; *Nimlet's Estate,* 299 Pa. 359, 365, 149 A. 658, 660. In construing an oral contract the question is always, what meaning is to be ascribed to the words employed, in the light of all the circumstances surrounding the agreement when it was made? While words are prima facie to be given their normal meaning, this does not necessarily obtain when the context of the conversation and the surrounding circumstances show that a different meaning was intended. However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, especially if, in connection with that subject-matter, the conventional interpretation would give an unreasonable or absurd result. The meaning of words in ordinary speech is rarely rigid and inflexible.

Applying these principles to the present controversy, it cannot be said, because of any imperious rule of construction, that when defendant agreed that "if there is no coal I will pay all expenses," it was necessarily the understanding of the parties that these words were to be taken literally and in their strict mathematical sense, so that if the slightest lump or particle of coal were found the condition on which McCormack's expenses were to be paid would not have been met. Was that intended by the parties? If not, what was intended? Was it that only the discovery of some appreciable or substantial quantity would relieve defendant of his obligation? Or was it the real purport of the negotiations, as detailed by McCormack, that defendant, being supremely confident that large quantities of coal existed under the tract, was willing to assure him that at least his expenses would be met, if not by the discovery of coal, then by defendant himself? Another question of interpretation of the contract exists in regard to the kind of coal

contemplated by the agreement. The subject-matter of the negotiations was out-crop coal; did the parties have in mind coal that might be found in a stump? Would a stripping operation be conducted with a view of finding such coal? Could the coal thus found be regarded as "out-crop coal" within the meaning of the contract? All these questions can be answered satisfactorily only in the light of the testimony concerning the conversations between the parties and of all the circumstances which surrounded the making of the agreement. They were factual questions entirely for the jury, and the subsequent conclusion of the court to decide them as a matter of law was therefore erroneous.

The court, in its opinion granting defendant's motion for judgment n. o. v., stated that "If the n. o. v. did not prevail, we could not avoid the grant of a new trial." We also are of opinion that a new trial should be granted in order to assure a fuller exposition to the jury of the nature and scope of its function in fixing the terms of the alleged agreement and the intention and understanding of the parties in their use of the language they employed. If the jury should find that there was no such contract as alleged by plaintiff, it will, of course, find a verdict for defendant. It will also find for defendant if, adopting McCormack's version of the terms of the agreement, it should conclude that those terms meant that he was not to be reimbursed for his expenses if *any* coal, even the slightest amount, was recovered, and irrespective of whether it was technically "out-crop" coal or coal from a "stump". If, on the other hand, the jury should find that defendant was to pay the expenses of McCormack if no "out-crop" coal was obtained, and that the coal discovered did not come within that classification, or that, even if the 313 tons be accepted as "coal" within the meaning of the contract, they were not in the appreciable, substantial, or otherwise sufficient amount to relieve defendant of his obligation to pay the expenses, then its verdict will necessarily be for plaintiff.

The judgment is reversed, and the record is remitted to the court below with directions to reinstate defendant's rule for a new trial and make it absolute.