Peter L. O'NEILL

v.

ARA SERVICES, INC., William S. Fishman, Lee F. Driscoll, Jr., Marvin D. Heaps and William M. Siegel.

Civ. A. No. 78–1441.

United States District Court,
E. D. Pennsylvania.

Aug. 8, 1978.

James E. Beasley, Philadelphia, Pa., for plaintiff.

Theodore W. Flowers, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This is a diversity action brought by Peter L. O'Neill, a former employee of ARA Services, Inc., for breach of a contract to employ plaintiff in a management position in ARA, for wrongful discharge from his employment, and for conspiracy to deprive plaintiff of his rightful occupation. Defendants are ARA Services, Inc.; William S. Fishman, President of ARA; and several

corporate officers of ARA. Defendants have moved to dismiss all three complaints for failure to state a claim upon which relief can be granted under F.R.Civ.P. 12(b)(6). The motion to dismiss is denied as to the first claim. As to the second and third claims, the motion is granted.

On such a motion, the Court must construe all well-pleaded facts as true. According to the complaint, plaintiff was employed as a vice-president of a security corporation when, in May, 1974, he was offered a job to establish a corporate security department for ARA. O'Neill rejected this offer saying he would consider employment with ARA only if it would lead to an executive position in operations within two years and only if the salary were $50,000 a year. At a subsequent meeting, President Fishman offered plaintiff employment with ARA at $50,000 a year plus fringe benefits to establish a security department to insure ARA compliance with federal regulatory statutes and to explore possible acquisition by ARA of security companies. President Fishman assured O'Neill that he would be entitled to leave security in two years and take a position in management of operations or as head of any security companies acquired by ARA. Later, plaintiff met with defendant Driscoll and again said that he would accept employment as security manager only if ARA promised him a position in operations within two years. Defendants Driscoll and Fishman assured plaintiff that should he accept employment with ARA as corporate security director, he would be entitled to a management position with ARA. The tenor of these offers was confirmed in a letter from defendant Driscoll. After describing plaintiff's broad security responsibilities and role in exploring purchase or internal development of a security business by ARA, Driscoll wrote: "We also contemplate that if this program [security business] bore fruit, you would be the line head of this operation." He continued,

"After [two years] we would anticipate that you would relinquish that responsibility [in security] . . . and either spend full time running what security

business we had developed to serve others during the two years or you would be free to move laterally into any ARA component in an operational capacity where it seemed appropriate for you to do so. I wouldn't think that there would be any shortage of such positions available."

In reliance on these assurances, plaintiff accepted ARA's offer and went to work for ARA as corporate security director on July 1, 1974.

Shortly after starting work, plaintiff was asked to investigate rumors of organized crime infiltration of an ARA subsidiary. He expressed concern that an extensive investigation would interfere with his broader security duties and might impede his advancement to an executive position in operations. Defendants Fishman and Driscoll told plaintiff that this investigation should take precedence over his other duties and they assured him that the investigation would not prevent ARA from honoring its commitment to place plaintiff in management of operations. According to the complaint, defendants repeated these assurances throughout the next two years.

Plaintiff spent the bulk of this time investigating illegal acts by ARA personnel. His investigations disclosed evidence that ARA subsidiaries were infiltrated by organized crime, that ARA funds were being used to finance loan-shark operations and to bribe public officials, and that certain executives were defrauding ARA of money. As a result, several key executives were terminated or asked to resign, including a member of the board of directors.

In the fall of 1976, plaintiff asked to begin formal training in operations. He was told that he would have to withdraw from his investigative work before beginning formal training. O'Neill was assured by all defendants that he would be guaranteed a position as regional vice-president at a salary commensurate with what he was then earning (about $64,000). He helped locate a replacement, left the investigation, and in February, 1977, began training in operations. During the next two months

plaintiff was by-passed for three regional executive openings without being given an opportunity to interview for the positions. Plaintiff complained. On May 2, 1977, he was fired without explanation.

Plaintiff alleges that defendant ARA breached its contract to employ plaintiff in management of operations after two years. As a result, plaintiff seeks damages for loss of earnings, loss of earning capacity, and damages to his professional reputation. The motion to dismiss will be denied as to the first count because the plaintiff should have the opportunity to prove at trial any facts and circumstances from which a jury could infer that defendants entered into a definite agreement to employ plaintiff in a management position for a reasonable period of time.

Defendants contend that plaintiff has not stated a claim for breach of contract because the employment agreement does not specify employment for a definite time period and is therefore terminable at will by either party for any reason. A contract of employment which does not specify a definite duration is presumed to be terminable at will by either party. The plaintiff may overcome this presumption by showing the intent of the parties that the contract last for some definite period of time or for a reasonable time. See *Cummings v. Kelling Nut Company*, 368 Pa. 448, 84 A.2d 323 (1951).

" . . . [I]n order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement. Thus contracts which do not fix a definite time for the duration of the relationship which they create are sometimes construed as providing for a rea-

sonable time or some particular period inferred from the nature and circumstances of the undertaking." *Slonaker v. P. G. Publishing Company*, 338 Pa. 292, 13 A.2d 48 (1940).

The intent of the parties to a contract with regard to the duration of the employment relationship in the absence of a specific provision has been treated by Pennsylvania courts as a factual matter to be decided by the jury. *See, e. g., Lubrecht v. Laurel Stripping Company*, 387 Pa. 393, 127 A.2d 687 (1956).[1]

In the present case, plaintiff O'Neill alleges that he left his former employment and worked for ARA for two years in reliance on the promise that he would be transferred to a management position after two years. He further alleges that he left his position as security director for ARA to train for management on the assurance that he would be promoted to regional vice president. If these allegations were established at trial, it would not be unreasonable for a trier of fact to conclude that the parties intended plaintiff's employment in management to extend for a reasonable period of time.

The defendants also contend that the first count should be dismissed because the alleged agreement is too vague to be enforced under Pennsylvania law. For the purposes of pleading, plaintiff's allegations contain a sufficiently definite oral agreement to allow him the opportunity of proving a definite agreement to a jury. Pennsylvania cases have held that whether the parties formed a complete contract is a question for the jury. Under Pennsylvania law, the determination of the terms of a disputed oral contract is the exclusive function of the jury as a question of fact; the legal effect of the agreement is the province of the courts as a matter of law.

---

1. Even when courts ultimately granted motions for summary judgment they acted only after the plaintiff had been given an opportunity to develop the facts of his case, not on a motion to dismiss. In *McKinney v. Armco Steel Corp.*, 270 F.Supp. 360, (W.D.Pa.1967) a motion for summary judgment was first denied and later granted but only after pretrial procedure was concluded and the record showed no genuine issue of material fact. In *Geib v. Alan Wood Steel Co.*, 419 F.Supp. 1205 (E.D.Pa.1976), the motion for summary judgment was granted because plaintiff failed to state any facts to overcome the presumption that the contract was terminable at will.

*McCormack v. Jermyn*, 351 Pa. 161, 40 A.2d 477 (1945). Plaintiff here has alleged an oral agreement, various assurances and commitments, a letter of confirmation, various modifications, a rate of pay, and an official title. Plaintiff's complaint will not be dismissed without giving him an opportunity to prove the existence of facts and circumstances which together may show a definite employment contract.

In the second count, plaintiff seeks compensatory and punitive damages for his allegedly wrongful discharge by defendants, "their primary motivation being concealment of the wrongful acts of ARA Services, Inc., and its employees and executives and their desire to prevent the plaintiff from continuing in the career which had been promised him as the condition of his employment." Defendants have moved to dismiss this claim as being insufficient under Pennsylvania law. Dismissal is appropriate when a complaint states a wrong for which there is clearly no remedy. *Melo-Sonics Corp. v. Cropp*, 342 F.2d 856 (3rd Cir. 1965). The motion to dismiss is granted because the courts of the Commonwealth do not provide a remedy for the tort of wrongful discharge where the plaintiff does not show defendant's specific intent to harm him or to act contrary to public policy.

Plaintiff relies on *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), for the proposition that Pennsylvania recognizes a cause of action for wrongful discharge. However, *Geary* does not support plaintiff's claim. In general, Pennsylvania courts do not recognize a cause of action for wrongful discharge; absent a statutory or contractual provision, the employer's right to hire and fire is virtually absolute. In *Geary*, the Pennsylvania Supreme Court declined to limit this right by recognizing a cause of action for wrongful discharge. Geary, a salesman employed by U.S. Steel for fourteen years selling tubular steel products, brought an action for wrongful discharge. He alleged that he complained about the product's safety, and pressed his complaint to the company vice president. The product was taken off the market. Geary was discharged without notice. The Pennsylvania Supreme Court affirmed the lower court's dismissal of the action. The *Geary* court held narrowly that an employee at will has no right of action against his employer for wrongful discharge but suggested that a discharge might plausibly give rise to a cause of action where the employer is motivated by a specific intent to cause harm to the employee or where a clear mandate of public policy is violated by the discharge. Neither element is present in this complaint.

First, O'Neill makes no allegations which permit the inference that he was discharged with specific intent to do him harm. In *Geary*, the court noted that an action for wrongful discharge based on the theory of malicious interference with prospective advantage is generally not available to an employee against his employer; either party to the employment relation is privileged to terminate that relationship at any time. The *Geary* court considered that a party to the employment relationship might have an action for wrongful discharge where this privilege was abused. "To this extent, [plaintiff's] proffered analogy to cases involving malicious abuse of recognized rights seems apt enough." *Id.* at 177, 319 A.2d at 177. However, the court found that Geary's allegations failed to add up to specific intent to harm him. Geary expressed his view as to the safety of a new product, by-passed his immediate superiors, took his case to a company vice president, and was ultimately discharged.

"There is nothing here from which we could infer that the company fired Geary for the specific purpose of causing him harm, or coercing him to break any law or otherwise to compromise himself. According to his own averments, Geary had already won his own battle within the company. The most natural inference from the chain of events recited in the complaint is that Geary had made a nuisance of himself, and the company had discharged him to preserve administrative order in its own house." *Id.* at 178, 319 A.2d at 178.

The deficiency of the complaint in the instant case is clearer than that in *Geary*. O'Neill alleges that he found criminal wrongdoing in the organization. He then asked to train for management and was transferred to management training. He complained that he was being overlooked for executive openings and was then fired. Nothing in these allegations suggests a specific intent to harm plaintiff other than a general desire to prevent him from continuing in the employment of ARA Services, Inc. *Geary* specifically rejected a cause of action based on a general intent to harm, "for some degree of harm is normally foreseeable whenever an employee is dismissed." *Id.* at 177, 319 A.2d at 177.

If O'Neill has an action for wrongful discharge, it would seem to rest on the theory that his discharge was in violation of public policy. In *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119 (Pa.Super.1978), Judge Spaeth concluded on the basis of *dicta* in *Geary* that Pennsylvania recognizes a cause of action for damages resulting from a discharge which violated the public interest. *Reuther* involved an employee who was discharged for failing to avoid jury service. The performance of jury service by a citizen being squarely in the public interest, Judge Spaeth held that the discharge was clearly an interference with that public interest. To a greater extent than in *Geary*, O'Neill's complaint fails to disclose that his discharge by ARA violated a clear mandate of public policy.

In support of his claim, O'Neill alleges that he discovered organized crime infiltration of ARA and that ARA did not disclose this wrongdoing to stockholders or the proper authorities. In order to conceal these wrongful acts, he asserts, ARA fired him. Clearly, ARA wanted to know about these things, not cover them up. The complaint states that ARA hired O'Neill at $50,000 a year to set up an internal security program and develop ARA's security business. ARA specifically requested that O'Neill investigate rumors of organized crime infiltration in ARA subsidiaries. It was O'Neill who was concerned that the investigation would deter his performance of other duties and might delay his advancement to a corporate executive position. ARA told O'Neill that the investigation of organized crime was to take precedence over his other duties. Clearly, ARA wanted to know about these things, not cover them up. At the specific direction of defendants, O'Neill spent the vast majority of his time over the next two years investigating illegal conduct by ARA personnel. The company acted on O'Neill's investigations and several key executives resigned or were fired. O'Neill was given "outstanding" ratings. According to the allegations, ARA in no way sought to interfere with O'Neill's investigation of organized crime. It was O'Neill who requested that he be removed from the investigation so that he might train for a management position. O'Neill located a replacement for his position and introduced the replacement to law enforcement officials. It was only after he was transferred to management training and after he had trained there for three months that O'Neill was fired. Nothing in the complaint suggests that defendants interfered with plaintiff's carrying out of a public policy objective. The court can only infer from the allegations that ARA encouraged O'Neill in his investigatory efforts. It is difficult to see how discharging plaintiff three months after he left his security position would help ARA to *conceal* wrongful acts. Nor is it possible to infer from the pleadings that ARA discharged O'Neill in retaliation for a successful investigation, particularly after ARA had encouraged that investigation over a two year period.

Finally, plaintiff alleges that ARA Services, Inc., President Fishman, and other corporate officers conspired to deprive plaintiff of his rightful occupation as an executive manager in the service industry, for which he seeks compensatory and punitive damages.

■ In support of this motion, plaintiff's brief states: "Again, the conspiracy count is controlled, we believe, by the reasonable implications of *Geary*." Plaintiff's

brief at 7. Since the reasonable implications of *Geary* do not provide plaintiff with a cause of action for the tort of wrongful discharge as this Court held *supra*, they also do not provide the basis for a claim of conspiracy to deprive plaintiff of his rightful employment.

 Plaintiff's right to his occupation could be based on the contract alleged or on the right to be free from malicious interference with prospective advantage. Under either theory, this action is dismissed against the corporation, ARA Services, Inc., since an employer cannot be said to conspire to induce breach of its own employment contract or terminate its own employment relationship. This count will also be dismissed as against the individual defendants because, according to the inferences of the complaint, they acted as agents of the corporation. The law is not entirely settled, as to whether the officers of the corporation can conspire with each other. The general rule, as developed in this circuit in antitrust cases, is that a corporation cannot conspire with itself anymore than a individual can, and the acts of the agents are the acts of the corporation. *Nelson Radio and Supply Corporation v. Motorola, Inc.*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *approved in dicta* in *Goldlawr, Inc. v. Shubert*, 276 F.2d 614 (3rd Cir. 1960). In *Johnston v. Baker*, 445 F.2d 424 (3rd Cir. 1974), in ruling on an action for conspiracy to harass a plaintiff in the conduct of his business, the Third Circuit Court of Appeals held that a corporation can conspire with its agents if the agents are acting for their own personal interests and one of the alleged conspirators is not an employee or agent of the corporation. There, the court declined to pass on the continued viability of *Nelson Radio*. Nothing in the present complaint suggests that defendants were at any time acting outside their roles as officers and agents of the corporation or that they were acting for personal motives.

 However, this Court need not base its dismissal of the claim against the corporate officers on an agency theory. The fact that defendants are the president and upper echelon executives in the corporation confers on them the privilege of interfering with plaintiff's employment relationship, *Menefee v. Columbia Broadcasting System, Inc.*, 458 Pa. 46, 329 A.2d 216 (1974). *See also* §§ 769, 772, Restatement of Torts; *Geib v. Alan Wood Steel, supra*. As executives in the corporation, the individual defendants were privileged to advise ARA Services, Inc. They had the necessary interest in ARA to interfere with plaintiff's employment relationship, provided they did not do so solely for their personal purposes. As stated above, nothing in the complaint indicates that defendants were acting out of ill will or for some other purpose unconnected to their interest in ARA.

Plaintiff also argues that because of a change in the composition of the Pennsylvania Supreme Court subsequent to the *Geary* decision, this court should hesitate to dispose of this case until it can ascertain the present state law.

"[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted [citation omitted]." *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 236, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

The replacement of one judge by another on the state's highest court does not provide "clear and persuasive indication" of any change in the state law. Pennsylvania courts have declined to recognize a cause of action broad enough to encompass the second and third counts in this case. This federal court should be reluctant to circumscribe private conduct of citizens of the Commonwealth where the courts of the Commonwealth have declined to do so.