## Peniston v. John Y. Huber Company.

*Master and servant—Contract—Right to discharge.*

Where a corporation employs a person " to be manager of its publishing department for the term of two years from this date, with reasonable and proper authority to conduct said department," and agrees to pay him a share of the profits and at the expiration of the contract a sum of money equal to one third of the value of the stock, copyright and plates, such person becomes merely an employee, and for any misconduct on his part inconsistent with the relation he had assumed as servant to his master, he may be discharged.

Disputed facts connected with the discharge of an employee, and alleged by the employer to have been reasonable cause for it, are for the jury; but whether it was proper under undisputed or admitted conditions relied upon as justifying it, is for the court.

*Master and servant—Discharge—Partner—Share of profits.*

Where the manager of a department of a business of a corporation, claims that he is a partner because he receives a part of the profits, which in fact are mere compensation for his services, and refuses to obey an order of the president to change his room from one story to another, and also refuses to submit to the president contracts which he had made for the company, he may be properly discharged.

Argued March 26, 1900. Appeal, No. 58, Jan. T., 1900, by defendant, from judgment of C. P. No. 2, Phila. Co., March T., 1892, No. 590, on verdict for plaintiff in case of W. W. Peniston v. John Y. Huber Company. Before GREEN, C. J., McCOLLUM, MITCHELL, MESTREZAT and BROWN, JJ. Reversed.

Assumpsit on a contract of employment. Before PENNYPACKER, P. J.

The facts appear by the opinion of the Supreme Court.

The court charged in part at follows:

[It is the duty of an employee to give obedience to reasonable directions given him by the employer about the performance of his duties.] [2] [I think we get, perhaps, the clearest idea of what was the difficulty between these parties, from a portion of the testimony of the plaintiff himself. He tells us: "Mr. Huber wanted me to change from the second story of the building at Eleventh and Ridge avenue and come down to the first floor of the main building, and have simply that office, and I told him no; that we ought to have the agents' department where it was, and that the small office on the ground floor, the rent did not amount to anything; it wasn't more than, probably eight by ten feet;" and that was what brought matters to a crisis.

He further testified when he was asked:

"Q. Did he tell you to go down to the first floor? A. Yes, sir. Q. He directed you to do it, did he? A. Yes, sir; and I declined. Q. You refused? A. I declined, because he had made a previous arrangement to have that second floor, and to have that department there, and I felt I had a partner's interest in it, instead of a position as a clerk."

I think that gives us a clue to the difficulty. The plaintiff was insisting that under this agreement his rights were those of a partner, and that, therefore, he was entitled to determine questions of that character, and the employer took the other view, that he was called upon to decide questions of location and questions of the general conduct and management of that business, and that this was a contract of employment, and not one of partnership. I have instructed you that in his view of it, the employer was in the right, and that the employee was in the wrong. This was a contract of employment.

Then the question arises as to whether or not that was a reasonable direction to give to an employee. If you look further in this case you can see many reasons why it may have been important that the work should be done in the room where the work was commenced on the first floor. This, you remember, was only one portion of the business. It may well have been in the conduct of his business that the employer needed that room for some other purpose. You have had it testified before you that a few months later than this occurrence the weight of the material in the upper floors of the building broke through

the floors, and the whole thing was precipitated below. This is a matter which a man knowing the general needs of the business might well take into consideration.

You have also heard that the president of the company was a man who was in ill health, and that it was difficult for him to mount the stairways. He may well have considered that it was important for him to have the business conducted where it would be convenient for him to supervise it. But without going into any conjectures about it, if it was a reasonable order which the employer gave then it would be the duty of the employee to obey it; if he did not, and he refused, he could well be discharged.] [3]

I take it, if you had a kitchen girl, and she insisted upon doing her cooking in the parlor because there happened to be more room in the parlor, you would feel that she might be properly discharged from that employment.

You may, for the purposes of this case, consider the president of the company as acting for the employer. There is no evidence to show us what was the authority conferred upon the president, but, ordinarily, he is the executive officer of a corporation, and that was an inquiry which the employee was not called upon to make. The directions of the president were the directions of the defendant. [It appears that the employer, Mr. Huber, asked the plaintiff here for the surrender of the written contracts which had been made with the customers. Was that a reasonable demand for him to make? You will remember that the large amount of capital necessary for the conduct of this business was supplied not by the plaintiff, but by the defendant, and the contracts were made with the defendant, and the funds were to come from him.

It appears that the plaintiff had been carrying those contracts around in his pocket. It does not need to look very far into it, it seems to me, to say that that was not a very safe nor a very desirable place to have the contracts. It is a question for you as to whether or not a demand for those papers, which were right at the foundation of the business, was a reasonable demand.] [4]

If the plaintiff was not discharged, or if he was properly discharged, under the terms of the contract, which provides that there should be an ascertainment of the profits at the end of

every three months and a payment to the plaintiff of his proportion of them, he would be entitled, if you are able to ascertain from this testimony, as to what his proportion of the profits was for the first three months, because three months had passed. To that sum he would be entitled, less the $20.00 a week which, it is conceded, had been paid to him.

If he was discharged without sufficient ground—if he was improperly discharged by his employer—then he would be entitled to receive what would compensate him for the loss he would have because of the failure to carry out the terms of the contract. At the expiration of the two years, in addition to one third of the net profits, he was to have one third of the value of the plates, copyrights, and stock. He has testified to you that those plates were, in his judgment, at the time of the alleged breach, worth about $20,000. He tells you there was stock there worth from $1,000 to $2,000, and he further testifies to you that upon one of these books, " The Prince of Peace," if I remember correctly, there had been sales amounting to 55,000 copies, and he estimates the profits upon each of those copies at fifty cents. If I have made that calculation correctly, that would amount to $27,500, and taking his view of it, if you find the facts his way and should believe the plaintiff's testimony in this respect, he would be entitled to such sum as would compensate him for what would be the value of one third at the expiration at the two years, less the sum of $20.00 per week.

You are told, however, by Mr. Evans that there was no profit at all. He states that in a very general way, but his statement was that there was no profit upon any of these books, and Mr. Huber has testified to you that the business was conducted at a loss; that there was a loss upon each of the books; and that with respect to " The Prince of Peace," the loss extended to the sum of $11,000.

In ascertaining the value you may get some aid from the fact that, at a period some months later than this, the Huber company sold out this business for $100,000. But that light is a very imperfect light, for the reason that that sum represented the whole business, including this department, and as to what was the value of the rest of the business we have no knowledge.

[There was also some evidence of an attempt at settlement between these parties, in which the suggestion was made of $10,000 in stock, and it was rejected for the reason, perhaps, that it is more or less problematical as to what was the value of the stock, although there is evidence that the stock of this company at the time was worth $125,000.] [5]

Verdict and judgment for plaintiff for $8,000. Defendant appealed.

*Errors assigned* were (2-5) above instructions, quoting them.

*H. B. Gill*, with him *Silas W. Pettit* and *John R. Read* for appellant.—Plaintiff was properly discharged: Libhart v. Wood, 1 W. & S. 266 ; Matthews v. Park Bros., 146 Pa. 384 ; Elliott v. Wanamaker, 155 Pa. 67 ; Stevens v. Crane, 37 Mo. App. 487 ; Tullis v. Hassell, 54 N. Y. Superior Ct. 391 ; Maynard v. Lumberman's Nat. Bank, 11 Atl. Repr. 529 ; Hyatt v. Johnston, 91 Pa. 196.

*John G. Johnson* for appellee.

OPINION BY MR. JUSTICE BROWN, July 11, 1900 :

The contract between the parties to this contention was clearly, as held by the learned president judge of the court below, one of employment. Its first clause is as follows : "Said company hereby employs said Peniston to be manager of its publishing department for the term of two years from this date, with reasonable and proper authority to conduct said department; and said Peniston hereby accepts said employment."

It is true that the appellee was to receive a proportion of the profits of the business, and, at the expiration of the contract, one third of the value of the stock, copyright and plates. He was not, however, to receive an interest in the latter, but to be paid a sum of money equal to one third of their value, to be ascertained in the manner stated in the agreement. He was an employee, engaged for a definite period at a compensation agreed upon by him and his employer, and was to be manager of its publishing department for the term of two years from July 16, 1890, "with reasonable and proper authority to

conduct said department." The error into which he seems to have fallen was as to his real relation to the appellant. He appears not to have understood, that, when he executed the agreement of July 16, 1890, he became, as stated, an employee for a fixed period, at a compensation agreed to by himself, that his right to receive his wages depended upon his faithful service, and that, for any misconduct on his part inconsistent with the relation he had assumed as servant to his master, the latter had an undoubted right, at any time, to put an end to the contract: Singer v. McCormick, 4 W. & S. 265. He was employed to be manager of a department " with reasonable and proper authority to conduct it," but, in exercising authority in that department, he was to be subordinate to a higher one, that of his employer, the corporation that had reserved to itself the right to supervise all its departments and the conduct of those managing them. It gave to this appellee simply authority to reasonably and properly conduct and manage his department, as its employee, at all times subordinate to it, his employer. The contract cannot be differently interpreted, and the court below was correct in so construing it.

Damages are claimed by the appellee for his alleged improper discharge by the appellant. This is his allegation, and notwithstanding the appellant's shifting position, a careful review of the evidence has satisfied us that there was a discharge. The first question, then, that arises is, was the discharge proper? Disputed facts connected with such a discharge, and alleged by the employer to have been reasonable cause for it, are for the jury; but whether it was proper, under undisputed or admitted conditions, relied upon as justifying it, is for the court: Matthews v. Park Brothers, 146 Pa. 384. There is no dispute as to the conduct of the appellee that led to his discharge. He admits that, when directed by the president of the company that had employed him to change his room from the second story of the building to the first, he declined, for the reason that he felt he had a partner's interest in the business, instead of a position as a clerk, and subsequently refused to deliver or submit to the president, until he could consult his counsel, the contracts that had been made for the sale of the books, published by the company employing him. This was insubordination and misconduct fully justifying his discharge, and the learned

trial judge should have so instructed the jury, instead of allowing them to determine whether he had been dismissed from service improperly and without cause. They should have been told that the order to occupy another room and the direction to submit or deliver the contracts to the president were reasonable and their disregard improper, justifying the discharge of the appellee. Even after the termination of the relations between the appellant and the appellee, they might have been restored, but for the persistent disposition of the latter to defy authority. When told that he could return to his duties, subject to the control of the company, he refused, insisting upon his own interpretation of the contract. His conduct, both before and after his discharge, showed a defiance of his employer's authority that made continued employment impossible.

Having been properly dismissed from his employment, the only remaining question is, whether the appellee is entitled to recover anything. The contract provides that, during its continuance, settlements were to be made every three months, "commencing as of the first day of November, 1890, and one third of the accrued net profits, as shown by said settlements, shall then be paid over to said Peniston." As he was discharged about the time the first settlement ought to have been made, in reversing this judgment we will order a new trial, that it may be determined, under evidence more satisfactory than has been produced, what profits, if any, had accrued to November 1, 1890, to one third of which he is entitled. All other compensation under the contract he forfeited by his misconduct and lost when he was properly discharged.

The error called to our attention in the fifth assignment was inadvertently made and will be avoided on the retrial.

Judgment reversed and a venire facias de novo awarded.