## Lightcap v. Keaggy, Appellant.

Argued April 22, 1937.

Before

KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Fred B. Trescher*, of *Kunkle, Walthour & Trescher*, for appellant.

*Charles C. Crowell*, with him *Howard H. Whitehead* and *Daniel V. Crowell*, of *Crowell & Whitehead*, for appellee.

OPINION BY STADTFELD, J., September 29, 1937:

The defendant, Dr. John B. Keaggy, appeals from a judgment of the Court of Common Pleas of Westmoreland County, Pennsylvania. The case was tried before COPELAND, P. J., and a jury, and resulted in a verdict for the plaintiff, Harry R. Lightcap. Motions for a

new trial and for judgment n. o. v. were overruled by the court in banc and judgment entered on the verdict.

The plaintiff's suit is based on an alleged oral contract under the terms of which he claims the defendant agreed to employ him as manager of certain real estate in Greensburg and to pay him at the rate of $100 per month each and every month during the term of his natural life.

The statement of claim avers that the oral agreement was made in 1907 and was ratified by a writing executed January 5, 1917. The plaintiff was discharged by the defendant on July 17, 1933, and claims wages at the rate of $100 a month for the months of August, September and October 1933. The statements set forth that on January 1, 1932, the defendant unlawfully reduced the plaintiff's wages to $50 per month, and he claims the difference, to wit, $50 per month, during the period from January 1, 1932 to August 1, 1933.

The affidavit of defense admitted that the plaintiff entered into the defendant's employ around the first part of 1908, and that the plaintiff continued in his employ until July 17, 1933, but denied any hiring for the term of the plaintiff's natural life at a salary of $100 per month, and denied the execution of the writing relied upon as a ratification of the oral agreement, and averred that if the signature thereon was genuine, it had been procured by fraud. It was further averred that the writing had been materially altered by the addition of a certain acknowledgment and affidavit which enabled the plaintiff to record the writing.

In connection with the reduction in wages on January 1, 1932, the defendant set forth that he had notified the plaintiff of the reduction and that the plaintiff had assented thereto, and agreed to perform such services as were required for the sum of $50 per month. While the defendant insisted that he had a perfect

right to terminate the relationship of employer and employee at any time, he averred by way of further defense, that irrespective of any contract of hiring he was justified and within his rights in discharging the plaintiff because of an assault made by the plaintiff upon him on June 11, 1932, and because he had learned that the plaintiff had violated his confidence by procuring his signature to certain deeds conveying property to straw-men and that the property pursuant to a secret understanding with the straw-men, was, in turn, conveyed by the straw-men to the plaintiff, Harry R. Lightcap.

At the trial the plaintiff testified that during the year 1907 he was living on a farm in Butler County when the defendant, a resident of Pittsburgh, sent for him and asked him to take charge of his properties in Greensburg. He testified that before going to Butler County, he had earned from two to three hundred dollars a month as salary and commission, and that the defendant had told him it would be better to go to Greensburg "for a life job at $100 a month." He further testified "He said he would give me $100 a month and furnish me a home." He detailed the various properties owned by the defendant in Westmoreland County and outlined the many duties performed by him during the twenty-five years he was in the defendant's employ. The duties, according to his testimony, ranged all the way from plowing and looking after the farms from time to time to managing a theater during one year.

With particular reference to the writing, Exhibit "A", which was dated January 5, 1917, he testified that it had been signed by Dr. Keaggy at the Strand Theater Building in the presence of one E. K. Snively, whose name appeared thereon as a witness. The writing purported to give him the right to occupy the dwelling on the "Williams" farm as long as he lived and to pur-

chase the same for $7,000 at any time, and contained the words, "The above lease or agreement is not to change or alter in any way my promise to Harry R. Lightcap of October, 1907, when I contracted to employ him as manager of my real estate at Greensburg, Pa., and agreed to pay him one hundred dollars for each and every month during his natural life time ......"

The writing bore the acknowledgment of the subscribing witness, E. K. Snively, dated May 29, 1933, and an affidavit by Mr. Snively, dated May 20, 1933. By means of this affidavit and acknowledgment, the plaintiff had been able to record the writing on July 18, 1933. The plaintiff admitted that the affidavit and acknowledgment had been executed and affixed without the knowledge or consent of the defendant.

He testified that in January 1932, Dr. Keaggy advised him that he was a little short of money and would have to cut down his pay for a time and that he had replied he had a life contract for $100 a month, and wanted Dr. Keaggy to live up to it. After that he was paid at the rate of $50 a month including the month of July when he was discharged. During the months of August, September and October 1933, he had received nothing.

Four witnesses testified that on occasions they had heard Dr. Keaggy make statements, the substance of which was that Mr. Lightcap had a life-time job. He, defendant, denied the statements attributed to him by other witnesses. He testified in detail about the assault in his office on June 11th.

In relation to the alleged assault of defendant by plaintiff, the plaintiff in rebuttal asserted that he had acted only in self defense and that the defendant was the aggressor, and insisted that Dr. Keaggy became angered when the plaintiff refused to sell out certain tenants and get possession of Dr. Keaggy's property.

The plaintiff, Harry R. Lightcap, occupied the farm house located on what is known as the Williams Farm. Exhibit "A", which was relied upon as a ratification of the oral agreement, purported also to give him the right to occupy this house as long as he lived.

The assignments of error relate to the refusal to enter judgment non obstante veredicto in favor of defendant, to certain portions of the charge of the court to the jury, and rulings on offers of evidence and the alleged improper admission of certain evidence.

The trial judge should have permitted the cross-examination of plaintiff, with reference to the insurance of plaintiff's property by the latter in defendant's name, and the payment therefor by the defendant; also with reference to plaintiff paying taxes on his own property and charging the same to defendant. He should also have permitted defendant to show the payment of taxes, repairs and insurance on behalf of defendant by plaintiff on the Williams' farm between October, 1923 and September, 1933, conveyed to Andrew Askounes by deed of defendant dated Oct. 10, 1923 and by said Askounes conveyed to plaintiff by deed dated Oct. 16, 1923. All this testimony would have a substantial bearing on the honesty and good faith of plaintiff and the justification of the discharge of plaintiff by defendant. The 6th, 7th, 11th and 12th assignments of error are therefore sustained.

The only testimony in support of the alleged agreement, outside of four witnesses who testified to alleged statements by the defendant that Mr. Lightcap had a lifetime job, was that of the plaintiff himself. The essential parts of his testimony on which he relies for a recovery are as follows: The plaintiff, Harry R. Lightcap, testified that in the early part of the year 1907, he had rented a farm in Butler County where he had gone for a rest. Dr. Keaggy sent for him about the middle of October 1907. The conversation relat-

ing to the contract took place in the office of Dr. Keaggy at Pittsburgh. "Q. Did he inform you why he had sent for you? A. Yes, sir. Q. Will you tell what the conversation was between you, incident now to the employment? A. He told me he was going to make a change in Greensburg. He wanted me to go up, I told him I would consider it, but I had a lease in Butler County I would have to take care of—it was for two years. He told me to see what I could do about the lease and then let him know. I went to the real estate man whose mother owned the farm, he said he would release me from this lease. Q. You made arrangements with him, did you come back to Dr. Keaggy? A. Yes, I had to pay $100.00 for the release. Q. What took place between you and Dr. Keaggy? A. He said he wanted me to go to Greensburg for a life position, he said he knew I made more in Pittsburgh, I made $200.00 to $300.00 a month salary and commission, he said it would be much better for me to go to Greensburg for a life job at $100.00 a month than to hold the job I had for $200.00 to $300.00. Q. What agreement did you make with Dr. Keaggy? What proposition did he make to you and what did you say in reply to it? A. He said he would give me $100.00 a month and furnish me a home, just as good as the one I had in Bellevue, which I rented when I went to the country. He wanted to know when I could go, and I said I could go in a couple of weeks after I disposed of my stock and farm implements. Q. Did you or not accept his proposition? A. Yes, sir. Q. When was that? A. About the last of October, 1907. Q. When did you come to Greensburg? A. Late in the year, the 2nd day of November, 1907."......"Q. Did he say what you were to do? A. I was to manage and supervise his property and his farms."

If the court is to conclude that the plaintiff had a contract of any kind, it must do so from the foregoing

testimony. It is the plaintiff's own version of what was said by Dr. Keaggy in 1907 when he claims the contract on which he seeks to recover was entered into.

There was much other testimony in the case but it all related to work actually performed by the plaintiff while in the employ of the defendant and to statements attributed to the defendant many years after the alleged contract was entered into, "A. He said he wanted me to go to Greensburg for a life position,......he said it would be much better for me to go to Greensburg for a life job......Q. Did you or not accept this proposition? A. Yes, sir......A. I was to manage and supervise the property and farms."

By way of corroboration, plaintiff offered in evidence the agreement in writing alleged to have been executed on January 5, 1917, hereinbefore referred to.

The subscribing witness, E. K. Snively, testified on the trial that he made the affidavit at the request of the plaintiff; it sets forth that he witnessed the signature of Dr. J. B. Keaggy, the defendant, on January 5, 1917 to an agreement, "made between him, the said Dr. J. B. Keaggy, and Harry R. Lightcap, wherein the said Dr. J. B. Keaggy employed the said Harry R. Lightcap for and during his natural life to act as agent for him, the said Dr. J. B. Keaggy, in the control of his real estate in and about the City of Greensburg, and that the consideration for his services would be One Hundred ($100) Dollars per month during his, the said Harry R. Lightcap's natural life." If this recital is intended to give the recollection or knowledge of the witness, it is inconsistent with the testimony of this witness at the trial wherein he states that at the time he signed his name as a witness, he did not hear any discussion of the agreement, had no idea of its contents, and so far as the terms of the agreement were concerned, he knew nothing about that, and that he had never seen the agreement between the time he

witnessed the signature and the time he was called upon to make the affidavit in May or June of 1933.

Objection was made to the admission of this agreement because of the addition of the acknowledgment and affidavit referred to, as being a material alteration after its execution by Dr. Keaggy, but the objection was overruled by the court and the paper admitted in evidence.

Irrespective of the acknowledgment and affidavit, and giving full effect to the paper as a duly executed instrument by the defendant, we do not think that it adds anything to the terms or force of the alleged oral agreement upon which plaintiff's right to recover is based. The controlling question in this case is the construction of the alleged oral agreement.

According to plaintiff's testimony, after the last sale in 1925, all of the defendant's property had been disposed of excepting one farm of 160 acres and seven dwelling houses; that the transactions involving the sale of real estate prior thereto amounted to approximately $400,000.

As stated by Mr. Justice SCHAFFER in *Seiss v. Mc-Clintic-Marshall Corporation,* 324 Pa. 201, 204, 205, 188 A. 109: " 'In order that a contract be enforceable the promise or the agreement of the parties to it must be certain and explicit, so that their full intention may be ascertained to a reasonable degree of certainty': *Edgcomb v. Clough,* 275 Pa. 90, 103, 118 A. 610, 614; *McNeely v. Bookmyer,* 292 Pa. 12, 15, 140 A. 542, 543; Restatement, Contracts, sec. 32; Williston on Contracts (Rev. Ed.), sec. 42. What is 'suitable employment'? Who is to determine what it is? What is implied by 'any employment that I was able to do'? Without more, these words are too indefinite to predicate anything upon with certainty. As was said by Judge ELDER W. MARSHALL in writing the majority opinion of the court below: 'In the contract here sued on, no

rate of pay is specified; no arbiter is provided to determine what work plaintiff will be able to perform from time to time; no provision is made as to whether he shall be paid when the plant is operating and he is unable to work, or when he is able to work but the plant is closed down. Is he to be paid if there is no position which he can fill, even though he is able to perform work of some character? Who shall determine what work is 'suitable', or when plaintiff is no longer capable of doing any suitable work? The supposed undertaking was to furnish employment for life, and yet it was left to conjecture whether such undertaking would terminate when plaintiff became incapacitated by reason of old age, or was to continue until his death.' "

Did the plaintiff assume, and was he warranted in assuming from this language that he was being offered and that he was accepting a job which would last as long as he lived? How many hours a day and how many days a week was he to work? Was he to be paid if he became ill? Was he to be paid if he became disabled and could no longer perform the services required of him? Was he to be paid if Dr. Keaggy sold his real estate? Could he engage in other work? Suppose Dr. Keaggy had died a year after the contract was entered into and the property passed to his heirs. Were the heirs bound to retain Mr. Lightcap? What was the consideration? Did Mr. Lightcap bind himself to remain in the defendant's employ all his life? What were his duties as manager and supervisor of farms and property? These and many other questions arise immediately when we consider whether the testimony is sufficient to show the existence of a definite contract of employment which was to endure for the life of one of the parties.

Quoting from Labatt on Master and Servant: Par. 175 "As a general rule the word 'permanent', as ap-

plied to an employment, will be regarded as meaning nothing more than that the employee is to hold the position until one or the other of the contracting parties shall desire to terminate the connection; in which event the dissatisfied party is to have the right to be relieved of further obligations to the other, upon fair and equitable terms, and after reasonable notice. Such a term is not to be understood in the sense that the parties are to be bound together by ties which can be dissolved only by mutual consent or for sufficient reasons." To same effect, A. & E. Encyclopaedia of Law, Vol. 20, p. 16.

In *Minter v. Tootle-Campbell Dry Goods Co.*, 187 Mo. Appeals 16, 172 S. W. 4 (1915), the plaintiff brought suit alleging that the defendant had employed him at a salary of $1,800 per year, to begin January 1, 1909, and to continue during the term of his natural life. He averred that the defendant dismissed him at the end of two years. The agreement had been made by correspondence consisting of letters and telegrams. One of the defendant's letters stated "I suppose at your age you will want to settle down into a permanent thing, and if you accept this position with us, it would be a permanent one." The plaintiff testified as to the contents of a letter which had been lost "It is a permanent place and that if I came he wanted me to understand that I was to come with the intention that I was to stay as long as I lived and to hunt no other position—with the understanding I was to work for no other house." In another letter, the defendant's president had written "I want you to come with the intention of staying permanently." The plaintiff had finally wired that he "accepted the position under the agreement as per correspondence." The court found he had been dismissed without cause, and on page 7, said—"Concede that the terms of the agreement should be gleaned from all the correspondence, and

that the New York letter should not be considered as withdrawing any promise or statement of Campbell made in his former letters, we find that all the statements plaintiff claims were made with reference to the duration of the employment fall short of constituting an offer of hiring for a definite term. The expressions 'I want you to come with the intention of staying permanently', in the last letter, and 'I want you to come. with the intention of staying as long as you live', and 'to hunt for no other position' and 'to work for no other house', mean substantially the same thing, i. e. that the hiring is intended to be for an indefinite, and not a temporary period, and will continue as long as the parties are satisfied with each other and desire to continue their relationship......Such was the view we entertained in *Harrington v. Railway,* 60 Mo. App. 223, where a servant injured by the negligence of his master released his claim for damages, partly in consideration of the master's promise to give him permanent employment, or, as stated in the language of the agreement, 'for as long a period as plaintiff should properly do the work so assigned him', we held that the additional consideration of the release of a valuable cause of action bespoke a mutual intention that as long as plaintiff properly performed the services he should continue therein during his natural life, and that such hiring was not indefinite or uncertain, since that is certain in law which depends upon a certain event. But we recognize the general rule that a hiring for an indefinite time is a contract determinable at the will of either party, and said that 'such might be the construction of a contract for steady and constant (or permanent) employment, where the sole consideration for the employment was the services rendered during the current time of the employment' ......The effort of plaintiff to show an additional consideration passing from him to defendant was abor-

tive, since it shows that he merely abandoned other activities and interests to enter into the services of defendant—a thing almost every desirable servant does upon entering a new service, but which, of course, cannot be regarded as constituting any additional consideration to the master."

In *Haldeman v. Read Machinery Co.*, 80 Pa. Superior Ct. 578 (1923) the court held the fact that the hiring was on the basis of $1,800 per annum did not indicate or raise a presumption that the hiring was for the period of a year or from year to year. The court, on page 580, quotes from Labatt on Master and Servant, section 160, "The preponderance of American authority in favor of the doctrine that an indefinite hiring is presumptively at will is so great that it is now scarcely open to criticism."

In *Hogle v. DeLong Hook & Eye Co.*, 248 Pa. 471 (1915), 94 A. 190, plaintiff sought to recover on a verbal agreement whereby the defendant agreed to employ him at a salary of $3,000 per year, payable in monthly installments, beginning August 16, 1909. Plaintiff continued in the defendant's employ until August 31, 1912, when he contended he was wrongfully dismissed in violation of the agreement commencing August 16, 1909, and sought to recover salary for fifty weeks following his dismissal. The court holding that there was no contract for a definite period notwithstanding the fact that payment was made on an annual basis said, on page 473—" 'In a contract of hiring, when no definite period is expressed, in the absence of facts and circumstances showing a different intention, the law will presume a hiring at will. The fact that the hiring is at so much per week, or month, or year, will raise no presumption that the hiring was for such period'......The appellant recognizes the difficulty he encounters in the rule, and avers that by implication the hiring in this case was for a year, but

the statement contains nothing from which such implication can be derived, and here is just where it comes short. With every fact alleged proved on a trial the presumption that the hiring was at will would remain to be overcome; the plaintiff would be obliged to go further and establish additional facts and circumstances warranting an inference that something more was in contemplation of the parties than can be derived from the contract as set out in the statement." See also *Smith v. Crum Lynne Iron & Steel Co.*, 208 Pa. 462, 57 A. 953; *Machen v. Budd Wheel Co.*, 294 Pa. 69, 143 A. 482.

The plaintiff's willful refusal to obey instructions was in itself sufficient to justify discharge.

Mr. Lightcap, in his testimony, admits that he willfully refused to obey his employer's instructions, and his testimony is not contradicted by anything on the record. He was giving his version of the assault, which occurred on June 10, 1933, and testified as follows: "Q. This all started over the fact that he wanted an accounting? A. No, all on account of him demanding me to sell out the tenants that were sick, in the hospital, and had death in the family. He demanded me to sell them out and get possession of his property. I said, it wasn't the right thing to do with old tenants. Q. If he wanted it done he would have to get some one else? A. To do for him, I wouldn't do that business. Q. To do that business? A. I wouldn't do that kind of work, I had five tenants, some in the hospital, some had buried their child, and I wouldn't do it. It was about the question of wages that day, I demanded my wages that day."

It was not for Mr. Lightcap to determine the wisdom of evicting tenants. The property belonged to Dr. Keaggy and if he wished possession of the property he had a right to have it, and it was part of Mr. Lightcap's

duties to obtain it. The willful refusal justified the discharge.

In *O'Neil v. Schneller,* 63 Pa. Superior Ct. 196 (1916), plaintiff had been employed for a definite term. The testimony was conflicting on the question of whether he had performed his duties satisfactorily and whether he had conducted himself properly toward his fellow employees. On page 199, the court said—"An employee, engaged for a given term, to charge the master with liability for wrongful discharge, must have rendered faithful service and have so conducted himself toward his fellow employees, and others who are brought in contact with him, as not to interfere with his master's business or with his or his fellow employees' usefulness in the proper discharge of their duties: *Hand v. Clearfield Coal Company,* 143 Pa. 408 (22 A. 709) ; *Matthews v. Park Bros. & Co., Ltd.,* 159 Pa. 579 (28 A. 435). Where the evidence sustaining a justification for discharge is disputed, the question of justification is for the jury, but where the facts are undisputed or admitted, it becomes one of law for the court."

In *Peniston v. John Y. Huber Company,* 196 Pa. 580 (1900), 46 A. 934, the plaintiff had testified "Q. Did he tell you to go down to the first floor? A. Yes, sir. Q. He directed you to do it, did he? A. Yes sir; and I declined. Q. You refused? A. I declined, because he had made a previous arrangement to have that second floor, and to have that department there, and I felt I had a partner's interest in it, instead of a position as a clerk." The court holding that binding instructions should have been given said, on page 585—"There is no dispute as to the conduct of the appellee that led to his discharge. He admits that, when directed by the president of the company that had employed him to change his room from the second story of the building to the first, he declined, for the reason that he felt he

had a partner's interest in the business, instead of a position as a clerk, and subsequently refused to deliver or submit to the president, until he could consult his counsel, the contracts that had been made for the sale of the books, published by the company employing him. This was insubordination and misconduct fully justifying his discharge, and the learned trial judge should have so instructed the jury, instead of allowing them to determine whether he had been dismissed from service improperly and without cause. They should have been told that the order to occupy another room and the direction to submit or deliver the contracts to the president were reasonable and their disregard improper, justifying the discharge of the appellee."

In *Matthews v. Park Bros. & Co.,* 159 Pa. 579 (1894), 28 A. 435, the plaintiff admitted in his testimony that the manager of the defendant company had ordered him to discontinue the use of sand on the rolls of the steel mill and to use fireclay instead. He stated he could not get along with fireclay and that he kept on using sand. The plaintiff had a two-year contract. On page 582 the court said—"There was no doubt, therefore, on the plaintiff's own testimony, about Worth's language. It was plain, direct, and without the slightest ambiguity. Under such circumstances its meaning was not a question for the jury but for the court."

In *Gallagher v. Wayne Steam Co.,* 188 Pa. 95 (1898), 41 A. 296, the testimony showed that the plaintiff as manager of the defendant company had been instructed to set his steam traps according to certain standards but that he persistently disobeyed this instruction. It was uncontradicted that on a particular day the defendant had instructed the plaintiff to install traps according to a well-known standard. The court held that the jury should have been instructed that if after that date, defendant stubbornly persisted in his own

method the company was justified in discharging him. See also *Carson v. Hosiery Co.*, 15 Pa. Superior Ct. 476 (1900).

Appellee in his argument invokes the principle of res judicata by reason of a bill in equity which had been filed by the present appellant against the present appellee in the Common Pleas Court of Westmoreland County, wherein the said Dr. John B. Keaggy charged the said Harry R. Lightcap with a scheme to defraud, and sought (1) a discovery of books and records relating to certain transactions in which defendant acted as agent for plaintiff, (2) an accounting, (3) a memorandum of properties which plaintiff alleges were fraudulently acquired by defendant, (4) nullification of a written instrument purporting to be a contract and lease, claimed by plaintiff to be a forgery or to have been procured by fraud, (5) a preliminary injunction against further prosecution of an action at law begun by defendant for the recovery of back wages, and a determination by the chancellor of the issues raised in the suit at law (the present action). The court below dismissed the bill and the Supreme Court in a Per Curiam, reported at 320 Pa. 8, 181 A. 474, affirmed the lower court, basing its decision mainly on the ground of laches.

A complete answer to appellee's contention might be found in the fact that the present appellee at no time, in his pleadings or in his brief, attempted to make the record in the equity case a part of the record in the instant case. However, waiving the fact that that record is not properly before us, we do not think that the equity proceeding is res judicata as to the present action. At best it could only be said that the court did not nullify the alleged written agreement and did not restrain further proceedings in the present action. The construction of the agreement and the merits of the present action were not involved or passed on therein.

After a careful consideration of the testimony, regarding it in the light most favorable to the plaintiff, we do not believe that the parties entered into a valid binding agreement under the terms of which the plaintiff was to be employed for the term of his natural life at a stated salary of $100, and therefore a recovery cannot be based thereon. In addition, under the undisputed and uncontradicted testimony of plaintiff himself, he willfully refused to carry out orders from the defendant and this fact alone justified the discharge of plaintiff.

The only matter which should have been submitted to the jury is in relation to the reduction of the salary of plaintiff from $100 per month to $50 per month for the period from January 1, 1932 up to August 1, 1933, which defendant claimed was mutually agreed upon, but denied by plaintiff.

Under the views hereinbefore expressed, it is not necessary to pass upon the other assignments of error.

The judgment is reversed and new trial granted.