## Carroll v. The Reuben H. Donnelly Corp.

*Reilly & Pearce,* for plaintiff.
*Benjamin O. Frick,* for defendant.

SMITH, P. J., February 2, 1945.—This matter comes before the court on two motions: one for a judgment non obstante veredicto and the other for a new trial. These motions were both filed by defendant.

The Reuben H. Donnelley Corporation is engaged in the business, inter alia, of obtaining advertisements from business people for the classified section of the telephone directory of the Bell Telephone Company of Pennsylvania. Plaintiff, Anthony M. Carroll, was one of the solicitors employed by it in March 1941, to secure advertisements for this directory. The agreement between the parties was an oral one. Under its terms it appears that, like all other solicitors of defendant, plaintiff was to secure a commission of 21 percent for new business, 7 percent for renewal of existing contracts, and 12 percent for the sale of additional space in the 1943 directory. The contract with the subscribers covered the placing of advertising in the directory, in "one issue" for a specific term of nine months. It was also agreed that the commissions were not payable to the solicitors of defendant until the respective advertisement of each of the subscribers appeared in that issue. Plaintiff, like the other solicitors, was paid a drawing account chargeable against his commissions when paid.

In the year 1942, due to a shortage of paper and a war manpower shortage, the Bell Telephone Company

decided to extend the classified section of its July 1942 directory for another period of four months, or until September 1943, making 13 months in all. At this time, defendant company set up a reserve account and a certain amount of its solicitors' commissions were withheld in that reserve account to protect it against the possibility of overdrafts as the result of any unexpected cancellations by subscribers. When this extension was determined upon by the Bell Telephone Company there were a number of its subscribers who had signed a contract for nine months in the one issue, but who had not as yet signed any contract for the extended four months.

On February 26, 1943, while plaintiff was soliciting advertising for the Bell Telephone Directory of September 1943, the oral agreement between him and defendant was terminated. Plaintiff, in his action in assumpsit, claims that he was improperly discharged by defendant and that he was entitled to the amount of commissions tentatively credited to him when his employment ended. Defendant, in its affidavit of defense, denies this averment and claims that plaintiff himself terminated his employment by taking a position with another company, and also that there are no commissions due him on account of the cancellations of subscribers' contracts as secured by him.

The primary question to be determined is whether defendant improperly breached the oral agreement with plaintiff, or whether plaintiff by his own actions was responsible for its termination. It appears that plaintiff was within the draft age and that in order to avoid joining the Army he sought a deferment by taking a position in an essential war industry. His testimony is that on or about February 4, 1943, he asked the general division manager, Mr. Carr, of defendant company, if he could take a position in an essential industry. Mr. Carr stated to him that he might if he would get a war-time job at night in his own territory.

Plaintiff testified that he took a job with the E. G. Budd Company at night in the territory where he solicited advertising for defendant. He testified that four days thereafter, or February 27, 1943, Mr. Carr again advised him that he could not hold two jobs, and that he would have to quit one or the other. Plaintiff testified that he could not quit an essential job for a nonessential job; that he then asked for the balance of his commissions due him, and that Mr. Carr stated that nothing would be paid him and that he should consider himself fired.

The testimony of Mr. Carr is that in January of 1943 plaintiff at the district office of Germantown, out of which he worked, asked him if he had any objection to plaintiff taking a drafting course at night; that Carr asked him if it would interfere in any way with defendant's business, and that plaintiff said "No . . . I do not want to go into the Army. In case I have to get a defense job, I want to be able to learn something in a defense plant". Carr testified that this was the only time plaintiff spoke to him about a defense job. He further testified that he did not fire plaintiff. He testified that he was present on February 27, 1943, with a Mr. Hugh L. Keiss, the Germantown district manager of defendant company, Mr. Gilbert J. Haber, the general manager, and plaintiff; and that they had before them a letter written by plaintiff to the company dated February 24, 1943, in which letter it was stated that plaintiff's draft board would grant a deferment if he secured a vital war-time job, otherwise he would be drafted on March 15, 1943; that he had decided not to attend a drafting school as it was not a vital war-time job and would take too long; that he got a job in the Budd Manufacturing plant which would permit his draft deferment; that his time in that defense plant would be from 6 p.m. to 1 a.m. from Monday to Friday, on Saturday from 9 a.m. to 5 p.m. and on Sunday from 8 a.m. to 5 p.m.; that these hours would permit him to work for defendant.

The witness, Carr, also testified that on February 27, 1943, at this meeting where plaintiff's letter was read, Mr. Haber, the general manager of defendant company, informed plaintiff that their job was a full-time one and that plaintiff would have to make his choice of either working for defendant company or some other company; that plaintiff then said that the work of defendant was nonessential; that he would take a defense job and that he was going to leave the employ of defendant; that plaintiff then asked to be paid what was due him and Mr. Haber replied that he would make a settlement with plaintiff at the end of the issue of the Bell Telephone directory, less any cancellations of the business that would come in between February 27, 1943, and the time the directory came out in September 1943. Mr. Haber, the general manager of defendant company, testified that when plaintiff came to him about taking a defense job he said to him that defendant's job was a full-time one, starting at 8:30 a.m. and lasting until 5:30 p.m. and in some instances until later; and that he could not do justice to both; that after this conversation plaintiff made his own choice to take a job with the Budd Manufacturing Company. Mr. Haber testified that he did not fire plaintiff, but gave him his choice of working for either defendant or the Budd Manufacturing Company.

Mr. Keiss, the Germantown district manager of defendant company, testified that early in February of 1943 plaintiff had spoken to him about taking a job at the Budd Manufacturing Company and that he said to plaintiff that, insofar as he was concerned, he would not permit him to work for Budd's and defendant at the same time, but that if he would write a letter, putting the reasons therein, he would take the matter up with Mr. Carr and Mr. Haber. Mr. Keiss testified that Mr. Haber had stated to plaintiff at that conference that plaintiff's job was a full-time one and asked him to stay with defendant, but that plaintiff stated he was going to work for Budd's.

It is evident from a reading of this evidence that, if defendant's story is to be believed, plaintiff had concluded that he could not give up an essential war-time job without running the hazard of being inducted into the military service, and that he therefore made the decision to work for Budd's after either Mr. Carr or Mr. Haber had informed him that he could not hold both jobs. There was nothing in the terms of his oral agreement permitting him to hold another position, and since the contract is silent on this subject the implication is that he would give his full day's work to the service of his employer. An employe owes to his employer his best efforts: Williston on Contracts 1014, §1013. If plaintiff had taken any outside job not interfering with the regular work of defendant company by which he had been employed, and then if defendant had discharged him therefor, it might have then been a question for the jury to determine whether or not the discharge by defendant was proper and reasonable under the circumstances. But here, under the evidence, it appears that, if the letter of February 23, 1943, was a voluntary one made of his own free will, plaintiff himself must have realized the impropriety of taking a job with the Budd Manufacturing Company at a time when he was working for defendant. The fact that he brought this matter to the attention of defendant would indicate his reactions to what he had done.

The work record of the Budd Manufacturing Company, which was in evidence, showed that its early working hours overlapped those hours when plaintiff should have been engaged in the work of defendant. If defendant's story is to be believed, the record shows that plaintiff had started working for the Budd Manufacturing Company on February 16, 1943, 11 days prior to February 27, 1943, when he testified that his employment had been terminated with defendant. The record also showed that he went to work at 3 p.m. and worked until 11 p.m. during the period of time when

he was employed by the Budd Manufacturing Company. From this evidence it would appear that plaintiff had terminated his employment by his own act and deed before he submitted the question of his dual employment to defendant. Then he placed the proposition before his employer for a solution and when he had submitted himself to the judgment of defendant, Mr. Haber, speaking for defendant, informed him that defendant's job was a full-time one and that he, plaintiff, must make the decision of working either for defendant or someone else. If this statement is believed, it is plain, direct, and without the slightest ambiguity.

If he made this decision after he was informed that he could not work for both companies, it logically follows that he terminated his own employment with defendant and he could not claim that he was wrongfully discharged.

In Williston on Contracts, §1017(3), it is stated:

"Disobedience which is accompanied with an element of insubordination and involves a direct refusal to recognize the master's authority in regard to the matter in question . . . though relating to a trivial matter and though causing no damage, will always justify immediate discharge."

See Lightcap v. Keaggy, 128 Pa. Superior Ct. 348.

In the case of Peniston v. John Y. Huber Co., 196 Pa. 580, 585, 586, Mr. Justice Brown said:

"Damages are claimed by the appellee for his alleged improper discharge by the appellant. This is his allegation, and notwithstanding the appellant's shifting position, a careful review of the evidence has satisfied us that there was a discharge. The first question, then, that arises is, was the discharge proper? Disputed facts connected with such a discharge, and alleged by the employer to have been reasonable cause for it, are for the jury; but whether it was proper, under undisputed or admitted conditions, relied upon as justifying it, is for the court: Matthews v. Park Brothers, 146

Pa. 384. There is no dispute as to the conduct of the appellee that led to his discharge. He admits that, when directed by the president of the company that had employed him to change his room from the second story of the building to the first, he declined, for the reason that he felt he had a partner's interest in the business, instead of a position as a clerk, and subsequently refused to deliver or submit to the president, until he could consult his counsel, the contracts that had been made for the sale of the books, published by the company employing him. This was insubordination and misconduct fully justifying his discharge, and the learned trial judge should have so instructed the jury, instead of allowing them to determine whether he had been dismissed from service improperly and without cause. They should have been told that the order to occupy another room and the direction to submit or deliver the contracts to the president were reasonable and their disregard improper, justifying the discharge of the appellee. Even after the termination of the relations between the appellant and the appellee, they might have been restored, but for the persistent disposition of the latter to defy authority. When told that he could return to his duties, subject to the control of the company, he refused, insisting upon his own interpretation of the contract. His conduct, both before and after his discharge, showed a defiance of his employer's authority that made continued employment impossible." See also Matthews v. Park Bro. & Co. Ltd., 159 Pa. 579, and Gallagher v. Wayne Steam Co., 188 Pa. 95.

However, the evidence of plaintiff raises an issue of fact. He testified that he could have worked at defendant's work and at Budd's without in any way neglecting defendant's work. He also testified in his rebuttal evidence that while he wrote the letter of February 23, 1943, to defendant he was coerced into doing it by Mr. Keiss; that the latter virtually dictated its contents and that the officials of defendant forced

him to write said letter so that they might have cause to discharge him. This testimony we do not believe. It is highly improbable. However it is a question for the jury. Because the weight of the evidence supports the contention of defendant, we believe that this case should again be presented to another jury for its determination.

### Order

And now, to wit, February 2, 1945, the motion for judgment non obstante veredicto is discharged; the motion for new trial is granted.